No. 22-1037

IN THE

# United States Court of Appeals
# for the Seventh Circuit

————————

MICHELLE R. GILBANK,
Plaintiff-Appellant,

v.

WOOD COUNTY DEPARTMENT OF HUMAN SERVICES ET AL.,
Defendants-Appellees.

————————

Appeal from the U.S. District Court for the Western District of Wisconsin,
No. 3:20-cv-601-jdp, Chief Judge James D. Peterson

————————

**APPELLANT'S BRIEF AND APPENDIX**

————————

JOSEPH S. DIEDRICH
   *Counsel of Record*
AJ FABIANCZYK
KIRSTEN A. ATANASOFF
ALYSSA M. LEROY*
HUSCH BLACKWELL LLP
33 E. Main St., Suite 300
Madison, WI 53703
(608) 255-4440
joseph.diedrich@huschblackwell.com
*Application for membership in Bar of this Court forthcoming*

*Counsel to Appellant*

# CIRCUIT RULE 26.1 DISCLOSURE STATEMENT
## (Joseph S. Diedrich)

Appellate Court No.: 22-1037

Short Caption:  <u>Michelle R. Gilbank v. Wood County Department of Human Services, et al.</u>

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first.  Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

    <u>Michelle R. Gilbank</u>

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    <u>Husch Blackwell LLP</u>

(3)  If the party or amicus is a corporation:

    i)  Identify all its parent corporations, if any; and

       <u>N/A</u>

    ii)  list any publicly held company that owns 10% or more of the party's or amicus' stock:

       <u>N/A</u>

---

Attorney's Signature:  <u>/s/ Joseph S. Diedrich</u>     Date:  <u>October 17, 2022</u>
Attorney's Printed Name:  <u>Joseph S. Diedrich</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  Yes  <u>X</u>  No  ___

Address:  Husch Blackwell LLP
       33 East Main Street, Suite 300
       P.O. Box 1379
       Madison, WI  53701-1379

Phone Number:  <u>(608) 258-7380</u>     Fax Number:  <u>(608) 258-7138</u>

E-Mail Address:  <u>Joseph.Diedrich@huschblackwell.com</u>

# CIRCUIT RULE 26.1 DISCLOSURE STATEMENT
## (AJ Fabianczyk)

Appellate Court No.: 22-1037

Short Caption:  Michelle R. Gilbank v. Wood County Department of Human Services, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first.  Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

    Michelle R. Gilbank

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Husch Blackwell LLP

(3) If the party or amicus is a corporation:

  i)  Identify all its parent corporations, if any; and

      N/A

  ii)  list any publicly held company that owns 10% or more of the party's or amicus' stock:

      N/A

---

Attorney's Signature:  /s/ AJ Fabianczyk    Date:  October 17, 2022
Attorney's Printed Name:  AJ Fabianczyk

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). Yes ___ No X

Address:  Husch Blackwell LLP
         33 East Main Street, Suite 300
         P.O. Box 1379
         Madison, WI 53701-1379

Phone Number:  (608) 258-6112    Fax Number:  (608) 258-7138

E-Mail Address:  AJ.Fabianczyk@huschblackwell.com

# CIRCUIT RULE 26.1 DISCLOSURE STATEMENT
## (Kirsten A. Atanasoff)

Appellate Court No.: 22-1037

Short Caption:  Michelle R. Gilbank v. Wood County Department of Human Services, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first.  Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

   Michelle R. Gilbank

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

   Husch Blackwell LLP

(3)  If the party or amicus is a corporation:

   i)   Identify all its parent corporations, if any; and

      N/A

   ii)  list any publicly held company that owns 10% or more of the party's or amicus' stock:

      N/A

Attorney's Signature:  /s/ Kirsten A. Atanasoff          Date:   October 17, 2022
Attorney's Printed Name:    Kirsten A. Atanasoff

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). Yes ___  No  X

Address:  Husch Blackwell LLP
         33 East Main Street, Suite 300
         P.O. Box 1379
         Madison, WI  53701-1379

Phone Number:    (608) 234-6024          Fax Number:      (608) 258-7138

E-Mail Address:    Kirsten.Atanasoff@huschblackwell.com

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT
## (Alyssa M. LeRoy)

Appellate Court No.: 22-1037

Short Caption:  Michelle R. Gilbank v. Wood County Department of Human Services, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first.  Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

   Michelle R. Gilbank

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

   Husch Blackwell LLP

(3)  If the party or amicus is a corporation:

   i)    Identify all its parent corporations, if any; and

      N/A

   ii)   list any publicly held company that owns 10% or more of the party's or amicus' stock:

      N/A

Attorney's Signature:  /s/ Alyssa M. LeRoy            Date:   October 17, 2022
Attorney's Printed Name:    Alyssa M. LeRoy

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). Yes __  No  X

Address:  Husch Blackwell LLP
      33 East Main Street, Suite 300
      P.O. Box 1379
      Madison, WI  53701-1379

Phone Number:    (608) 234-6087            Fax Number:     (608) 258-7138

E-Mail Address:   Alyssa.LeRoy@huschblackwell.com

*\*\*\*Alyssa M. LeRoy is not yet a member of the Bar of this Court. Her application for membership is forthcoming.*

iv

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................ vii

JURISDICTIONAL STATEMENT ...................................................... 1

STATEMENT OF THE ISSUES........................................................... 2

STATEMENT OF THE CASE .............................................................. 3

STANDARD OF REVIEW.................................................................. 10

SUMMARY OF ARGUMENT ............................................................ 11

ARGUMENT .................................................................................... 15

I.   The district court erred to the extent it dismissed Gilbank's 42 U.S.C.
     § 1985 claims as untimely........................................................... 15

II.  The district court had subject-matter jurisdiction, because *Rooker-Feldman* does not bar Gilbank's claims. ............................................ 16

     A. *Rooker-Feldman* is an exceedingly narrow jurisdictional rule—and
        nothing more. ....................................................................... 16

     B. *Exxon* and this Court's caselaw teach that *Rooker-Feldman* does not
        bar "independent" federal claims. ......................................... 19

     C. Gilbank's claims are "independent," because they do not "directly
        challenge" the state-court judgment. .................................... 23

     D. Gilbank's claims also are "independent," because they are not
        "inextricably intertwined" with the state-court judgment. ........... 30

     E. Regardless, Gilbank lacked a reasonable opportunity to raise her
        claims in state court.............................................................. 36

III. The Court should reverse and remand for consideration of all other
     issues.    ................................................................................... 42

     A. The Court should remand for consideration of further threshold
        issues on which the district court has not yet ruled........................ 42

     B. The Court should disregard the district court's advisory opinion on
        the merits. ........................................................................... 44

CONCLUSION.................................................................................. 46

CERTIFICATE OF COMPLIANCE ............................................................... 48

CERTIFICATE OF SERVICE ...................................................................... 49

APPENDIX ................................................................................................. 50

CIRCUIT RULE 30(d) STATEMENT ......................................................... 50

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Andrade v. City of Hammond, Ind.*,
   9 F.4th 947 (7th Cir. 2021) ............................................................ passim

*Arnold v. KJD Real Est., LLC*,
   752 F.3d 700 (7th Cir. 2014) ..................................................... 14, 16, 43

*Bauer v. Koester*,
   951 F.3d 863 (7th Cir. 2020) ........................................................ 33, 34

*Behr v. Campbell*,
   8 F.4th 1206 (11th Cir. 2021) ....................................................... passim

*Brokaw v. Weaver*,
   305 F.3d 660 (7th Cir. 2002) ........................................................ passim

*Cavin v. Mich. Dep't of Corr.*,
   927 F.3d 455 (6th Cir. 2019) .............................................................. 43

*Cutter v. Wilkinson*,
   544 U.S. 709 (2005) ........................................................................... 43

*Dillon v. Ind. Dep't of Child Servs.*,
   841 F. App'x 1003 (7th Cir. 2021) ...................................................... 46

*Dist. of Columbia Ct. of Appeals v. Feldman*,
   460 U.S. 462 (1983) ....................................................................... 1, 17

*Ernst v. Child & Youth Servs. of Chester Cnty.*,
   108 F.3d 486 (3d Cir. 1997) ..................................................... 27, 37, 38

*Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*,
   544 U.S. 280 (2005) ........................................................................ passim

*Friends of the Everglades v. U.S. E.P.A.*,
   699 F.3d 1280 (11th Cir. 2012) .......................................................... 45

*GASH Assocs. v. Vill. of Rosemont*,
   995 F.2d 726 (7th Cir. 1993) .............................................................. 24

*Gbur v. City of Harvey, Ill.*,
   835 F. Supp. 2d 600 (N.D. Ill. 2011) .................................................. 33

*Goodman ex rel. Goodman v. Sipos*,
   259 F.3d 1327 (11th Cir. 2001) ................................................................ 43

*Green v. Mattingly*,
   585 F.3d 97 (2d Cir. 2009) ................................................... 19, 26, 27, 28

*Hoagland v. Town of Clear Lake, Ind.*,
   415 F.3d 693 (7th Cir. 2005) ................................................................ 15

*Holloway v. Brush*,
   220 F.3d 767 (6th Cir. 2000) .......................................................... 26, 27

*In re Termination of Parental Rts. to Daniel R.S.*,
   2005 WI 160, 286 Wis. 2d 278, 706 N.W.2d 269 ................................ 41

*In re Termination of Parental Rts. to Joshua S.*,
   2005 WI 84, 282 Wis. 2d 150, 698 N.W.2d 631 .................................. 41

*Indep. Tr. Corp. v. Stewart Info. Servs. Corp.*,
   665 F.3d 930 (7th Cir. 2012) ................................................................ 10

*Iqbal v. Patel*,
   780 F.3d 728 (7th Cir. 2015) ................................................................ 21

*Jakupovic v. Curran*,
   850 F.3d 898 (7th Cir. 2017) .......................................................... 20, 21

*James v. Hale*,
   959 F.3d 307 (7th Cir. 2020) ................................................................ 10

*Johnson v. Pushpin Holdings, LLC*,
   748 F.3d 769 (7th Cir. 2014) ................................................................ 35

*Kovacic v. Cuyahoga Cnty. Dep't of Child. & Fam. Servs.*,
   606 F.3d 301 (6th Cir. 2010) ....................................................... passim

*Long v. Shorebank Dev. Corp.*,
   182 F.3d 548 (7th Cir. 1999) ....................................................... passim

*Loubser v. Thacker*,
   440 F.3d 439 (7th Cir. 2006) .......................................................... 25, 33

*Mathis v. Metro. Life Ins. Co.*,
   12 F.4th 658 (7th Cir. 2021) ................................................................ 44

*Milchtein v. Chisholm*,
   880 F.3d 895 (7th Cir. 2018) ................................................................ 21

*Moore v. Maricopa Cnty. Sheriff's Office*,
　657 F.3d 890 (9th Cir. 2011) ........................................................ 45

*Philos Techs., Inc. v. Philos & D, Inc.*,
　645 F.3d 851 (7th Cir. 2011) ........................................................ 23

*Resnick v. KrunchCash, LLC*,
　34 F.4th 1028 (11th Cir. 2022) .................................................... 45

*Richardson v. Koch L. Firm, P.C.*,
　768 F.3d 732 (7th Cir. 2014) ........................................................ 21

*Rooker v. Fidelity Tr. Co.*,
　263 U.S. 413 (1923) ............................................................... 1, 17

*Royal v. Payne*,
　No. 22-1184, 2022 WL 4008718 (7th Cir. Sept. 2, 2022) .............. 27

*Sanders v. Ind. Dep't of Child Services*,
　806 Fed. App'x 478 (7th Cir. 2020) .............................................. 27

*Santiago v. Walls*,
　599 F.3d 749 (7th Cir. 2010) ........................................................ 10

*Sharp v. Ford Motor Credit Co.*,
　615 F.2d 423 (7th Cir. 1980) .................................................. 14, 43

*Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*,
　549 U.S. 422 (2007) .............................................................. 14, 44

*State Wholesale Grocers v. Great Atl. & Pac. Tea Co.*,
　258 F.2d 831 (7th Cir. 1958) ........................................................ 43

*Steel Co. v. Citizens for a Better Env't*,
　523 U.S. 83 (1998) ............................................................... 44, 46

*Stop Reckless Econ. Instability Caused by Democrats v. Fed. Election Comm'n*,
　814 F.3d 221 (4th Cir. 2016) .................................................. 44, 46

*Swartz v. Heartland Equine Rescue*,
　940 F.3d 387 (7th Cir. 2019) ...................................... 20, 21, 33, 34

*Sykes v. Cook Cnty. Cir. Ct. Prob. Div.*,
　837 F.3d 736 (7th Cir. 2016) ........................................................ 21

*Target Media Partners v. Specialty Mktg. Corp.*,
    881 F.3d 1279 (11th Cir. 2018)..................................................................... 18

*Todd v. Weltman, Weinberg & Reis Co., L.P.A.*,
    434 F.3d 432 (6th Cir. 2006).......................................................................... 33

*VanderKodde v. Mary Jane M. Elliott, P.C.*,
    951 F.3d 397 (6th Cir. 2020)................................................................... passim

*Wood v. Orange Cnty.*,
    715 F.2d 1543 (11th Cir. 1983)..................................................................... 37

*Zurich Am. Ins. Co. v. Superior Ct. for the State of Cal.*,
    326 F.3d 816 (7th Cir. 2003).......................................................................... 33

## **Statutes**

28 U.S.C. § 1291 ................................................................................................... 1

28 U.S.C. § 1331 ................................................................................................... 1

28 USC § 1257 .................................................................................................... 16

42 U.S.C. § 1983 ............................................................................................ 1, 14

42 U.S.C. § 1985 ......................................................................................... passim

42 U.S.C. § 1986 ...................................................................................... 1, 9, 14

Wis. Stat. § 48.13 .............................................................................................. 39

Wis. Stat. § 48.14 .............................................................................................. 39

Wis. Stat. § 893.54 ...................................................................................... 15, 41

## **Other Authorities**

Allison B. Jones, *The Rooker-Feldman Doctrine: What Does It Mean to Be
    Inextricably Intertwined?*, 56 Duke L.J. 643 (2006) ................................ 22

Howard M. Wasserman, *Jurisdiction and Merits*, 80 Wash. L. Rev. 643
    (2005)...................................................................................................... 23, 45

## **Treatises**

21 C.J.S. Courts § 283 .................................................................................. 16, 17

**<u>Constitutional Provisions</u>**

U.S. Const. Art. III § 1 ................................................................................ 16

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 28 U.S.C. § 1331, because Plaintiff-Appellant Michelle R. Gilbank, individually and as next friend of her daughter, T.E.H., brought federal claims under 42 U.S.C. §§ 1983, 1985, and 1986.

This Court has appellate jurisdiction under 28 U.S.C. § 1291, because this appeal is from a final order that disposes of all claims. On December 10, 2021, the district court entered an order granting summary judgment in defendants' favor. App.2–16; R.131. Specifically, the district court ruled that the *Rooker-Feldman*[1] doctrine deprived it of subject-matter jurisdiction. App.12–13; R.131:11–12. Judgment was entered on December 10, 2021. App.1; R.132. On January 10, 2022, Gilbank timely filed a notice of appeal. R.138.

In addition, earlier in the case on December 15, 2020, the district court entered an order dismissing certain claims and certain parties at the pleadings stage. App.17–28; R.41. On appeal, Gilbank challenges one aspect of this order. *See infra* Argument I.

---

[1] *Rooker v. Fidelity Tr. Co.*, 263 U.S. 413 (1923); *Dist. of Columbia Ct. of Appeals v. Feldman*, 460 U.S. 462 (1983).

## STATEMENT OF THE ISSUES

I.  Did Gilbank bring her claims for violations of 42 U.S.C. § 1985 within the applicable three-year limitations period?

*

II. Are Gilbank's claims under 42 U.S.C. §§ 1983 and 1985—under which she seeks monetary damages, does not ask a federal court to adjudicate custody of T.E.H., and does not complain of injury caused by the underlying state-court custody judgment itself—independent of that state-court custody judgment, such that *Rooker-Feldman* does not apply and the district court had subject-matter jurisdiction?

*

III.Given that the district court did not opine on other threshold issues and could not exercise hypothetical jurisdiction to decide merits issues, should this Court reverse and remand for consideration of all other issues?

## STATEMENT OF THE CASE

Michelle Gilbank is a mother to three daughters, two of whom are now adults. App.37; R.6:9.[2] The third, T.E.H., was from birth until age four—and is now again—under Gilbank's primary care and custody. *Id.*; App.3, 11; R.131:2, 10. Nurtured by a "strong and loving bond" with her mom, T.E.H. led a "happy and healthy" life. App.37; R.6:9; App.3, 11; R.131:2, 10. At the same time, Gilbank struggled with mental health challenges, including post-traumatic stress disorder (PTSD). App.37; R.6:9. These challenges, exacerbated by an abusive living situation, drove her toward drug use. *Id.*

As of July 2018, Gilbank was actively working to secure safe and stable housing and mental health care: she had contacted a health clinic, found a lead on an apartment, and obtained funds for a security deposit. App.5; R.131:4. The events that transpired that summer, however, interrupted those efforts and ultimately resulted in Gilbank losing custody of T.E.H. for over a year, inflicting continuing trauma on mother and daughter both. App.37, 50; R.6:9, 22.

**A.** In November 2017, T.E.H.'s biological father, Ian Hoyle—who had a prior conviction for first-degree sexual assault of a six-year-old girl—was granted supervised visitation rights to T.E.H. App.18; R.41:2; App.37; R.6:9; App.3; R.131:2. Several months later, in March 2018, Gilbank and T.E.H. moved in with Hoyle temporarily after the house where they had been living went into foreclosure. App.3;

---

[2] These facts are primarily (and appropriately) drawn from Gilbank's amended complaint and the district court's rulings. *See infra* note 4.

R.131:2. Gilbank thought her presence during Hoyle's visitation periods could keep T.E.H. safe. App.37; R.6:9.

The living situation at Hoyle's apartment was fraught from the start. Hoyle regularly subjected Gilbank and T.E.H. to abuse fueled by near-daily alcohol and drug use, forcing Gilbank and T.E.H. to frequently seek shelter elsewhere. App.18; R.41:2; App.37; R.6:9.

On June 29, 2018, two City of Marshfield police officers conducted a welfare check after a neighbor reported that Hoyle had yelled at Gilbank and locked her and T.E.H. out of the apartment, and that Gilbank and T.E.H. appeared to be living in the garage. App.19; R.41:3; App.37; R.6:9; App.4; R.131:3. Theresa Heinzen-Janz, a Wood County social worker, soon joined the officers. App.19; R.41:3; App.37; R.6:9. Gilbank conveyed to Heinzen-Janz her worries about ongoing safety issues at the apartment and asked for help securing housing and mental health care. App.19; R.41:3; App.37; R.6:9; App.4; R.131:3. Heinzen-Janz said she would come back the next week. App.19; R.41:3; App.37; R.6:9.

Before Heinzen-Janz returned on July 3, Hoyle told Heinzen-Janz and Marshfield Police Detective Derek Iverson that Gilbank had drug problems. App.38; R.6:10. Consequently, at her return meeting with Gilbank, Heinzen-Janz brought Iverson with her and centered the meeting on Gilbank's drug use—not housing and mental health resources. App.19; R.41:3. Gilbank was also made to take a drug test after she acknowledged she had used drugs in the past to alleviate her PTSD symp-

toms. *Id.* Heinzen-Janz forged Gilbank's signature to indicate the drug test was voluntary. *Id.*

Iverson next visited the residence on July 26, in response to a call from Hoyle asking that Gilbank be removed from the apartment. *Id.* Hoyle made the call after punching holes in the walls of the residence and ripping his phone in half while yelling at Gilbank. *Id.* When Iverson and another Wood County social worker arrived, Iverson directed Gilbank and T.E.H. to sleep in the garage that night, yet he did not file an incident report. *Id.*; App.38; R.6:10.

Hoyle's behavior reached a breaking point shortly thereafter. One night, Gilbank awoke to Hoyle attempting to undress her. The next morning Gilbank found Hoyle sitting beside T.E.H. in the living room—he was naked, masturbating, and watching pornography on the television. App.19–20; R.41:3–4. Gilbank left with T.E.H. App.20; R.41:4; App.38; R.6:10.

**B.** On the morning of August 21, 2018, Gilbank informed Hoyle that she had an appointment for housing assistance and would be moving out with T.E.H. App.20; R.41:4; App.39; R.6:11. In response, Hoyle contacted Defendants Iverson, Heinzen-Janz, and Anne La Chappelle, another Wood County social worker, about removing T.E.H. from Gilbank's custody. App.20; R.41:4.

As Gilbank and T.E.H. left the housing appointment, a Marshfield police officer stopped their car and told Gilbank she was driving with a suspended license for failure to pay a $10 ticket. *Id.*; App.39; R.6:11. A K9 unit arrived, and the officer ordered Gilbank and T.E.H. to leave the car so it could be searched. App.20; R.41:4;

App.39; R.6:11. After the search revealed drugs and paraphernalia in the car, Gilbank was arrested, charged with possession of methamphetamine—which she maintained belonged to Hoyle—and questioned at the Marshfield Police Department by Iverson and Heinzen-Janz. App.20; R.41:4; App.40; R.6:12. Even after Gilbank requested an attorney, Iverson continued to question her without an attorney present. App.21; R.41:5; App.40; R.6:12. Gilbank learned later that day that T.E.H. had been placed with Hoyle, that Gilbank was not to have contact with T.E.H., that Gilbank could not return to Hoyle's apartment, and that a temporary custody hearing would take place within 48 hours. App.40; R.6:12. On August 22, Gilbank posted bail. *Id.*; App.21; R.41:5.

**C.** After removing T.E.H. to Hoyle's custody, and while Gilbank was still in jail, Heinzen-Janz filed a request for temporary physical custody in Wood County Juvenile Court and a petition for a child in need of protective services (commonly referred to as a CHIPS petition). *See* Wis. Stat. § 48.13(10). The CHIPS petition stated that Gilbank continued to deny her drug use, refused to cooperate, and was consistently under the influence. App.6; R.131:5. On August 23, 2018, the Wood County Juvenile Court held a temporary physical custody hearing without Gilbank present. App.21; R.41:5. Gilbank did not receive notice of that hearing: although Heinzen-Janz contacted the jail to notify Gilbank of the hearing, Gilbank had already been released. App.7; R.131:6. After hearing from T.E.H.'s guardian ad litem—who had not yet met T.E.H. or Gilbank—Judge Gregory Potter determined probable cause existed to believe that Gilbank was neglecting T.E.H., or was unable to provide ade-

quate supervision and care of T.E.H.; he then placed T.E.H. in the temporary custody of Hoyle. App.21; R.41:5; App.7; R.131:6.

That same day, Gilbank returned to the courthouse to ask about the custody hearing, only to find out it had already taken place. App.21; R.41:5. Gilbank wrote to Judge Potter to contest the action and request that the hearing be reopened; Judge Potter recused himself and transferred the case to Judge Nicholas Brazeau Jr., who denied Gilbank's requests. App.21; R.41:5; App.40; R.6:12; App.7–8; R.131:6–7.

The juvenile court held two evidentiary hearings on the CHIPS petition. At the first, on September 25, 2018, Iverson and Hoyle both testified that T.E.H. had been well-cared for when with Gilbank. App.22; R.41:6; App.8; R.131:7. Hoyle also admitted he had used drugs. App.22; R.41:6; App.8; R.131:7. Nevertheless, after concluding Gilbank was lying about her drug use, the court ordered that T.E.H. remain with Hoyle. App.22; R.41:6; App.8; R.131:7. The second hearing, on October 29, 2018, resulted in a court order leaving T.E.H. with Hoyle for at least a year, based on testimony from Heinzen-Janz that reunification with Gilbank would not be possible due to Gilbank's drug use and lack of cooperation. App.9–10; R.131:8–9.

Around these same time periods, Gilbank also expressed concern about Hoyle's drug and alcohol use to Wood County social worker Mary Christensen, but Christensen increased restrictions on Gilbank's visits with T.E.H. in response. App.22; R.41:6. Additionally, Christensen, Heinzen-Janz, and Iverson shared with Hoyle Gilbank's urine test results and mental health prescriptions. *Id.*

The juvenile court then ordered the CHIPS case closed because the custody and physical placement of T.E.H. was at issue in a separate case in family court. App.10; R.131:9. Gilbank appealed the closure order, which the Wisconsin Court of Appeals dismissed on standing and other grounds. *Id.*

In February or March 2020, following Hoyle's admission that he placed his fingers on T.E.H.'s vagina daily, Gilbank regained full custody of T.E.H. App.22; R.41:6; App.36; R.6:8; App.10; R.131:9.

**D.** In June 2020, Gilbank filed a federal complaint in the Western District of Wisconsin on behalf of herself and as next friend of T.E.H. against the Wood County Department of Human Services; four Wood County social workers (Heinzen-Janz, Christensen, La Chapelle, and Mary Solheim); Children's Hospital of Wisconsin; the Marshfield Police Department; Detective Iverson; and Judges Potter and Brazeau. App.17, 22; R.41:1, 6; App.29–30; R.6:1–2. As stated in her amended complaint, Gilbank alleges, among other things, multiple constitutional and statutory violations:

- Unlawful search for "taking a urine sample without a warrant." App.11; R.131:10; *see also* App.38, 41; R.6:10, 13 (alleging that Iverson "badgered" Gilbank; that Gilbank was "frightened," "in shock," and "confused;" that Iverson "coerced" her into a taking a drug test while "under duress;" that Heinzen-Janz "forged" Gilbank's initials on the test form).

- Unlawful seizure of T.E.H. and related due process violations for "temporarily placing T.E.H. with Hoyle without probable cause to believe that T.E.H. was in danger." App.11; R.131:10; *see also* App.39, 43; R.6:11, 15 (alleging that defendants and others conspired to remove, and did remove, T.E.H. from Gilbank's custody without "prior judicial authorization," "court order," "warrant," or other lawful basis; and further alleging that no "exigency" existed and that "[n]one of the Defendants sought, or obtained . . . any . . . type of warrant or court order, prior to seizing T.E.H.").

8

- Substantive due process violations for interference with familial relations, including prior to and as a result of T.E.H.'s seizure, based on many of the same facts as the unlawful seizure of T.E.H. itself. *See* App.40, 43–44; R.6:12, 15–16; App.11; R.131:10.

- Due process violations for "pursuing the CHIPS petition based on false and incomplete information about Gilbank and Hoyle." App.11; R.131:10; *see also* App.38, 40–41; R.6:10, 12–13 (alleging that Heinzen-Janz and Iverson "[gave] false information to the court to justify their emergency removal of T.E.H. without a warrant or probable cause").

- Due process violations for failing to provide Gilbank "a lawyer to her during her post-arrest interrogation." App.11; R.131:10.

- Due process violations for "failing to give Gilbank adequate notice and an opportunity to be heard regarding T.E.H.'s placement." App.11; R.131:10; App.38, 40–41; R.6:10, 12–13.

- *Monell* claims against the Marshfield Police Department for enforcing policies or practices related to Iverson's conduct. App.45–46; R.6:17–18.

*See generally* App.43–50; R.6:15–22; App.22; R.41:6.

The defendants filed motions to dismiss. In an order on the motions to dismiss, the district court dismissed (1) T.E.H.'s claims without prejudice, reasoning that without counsel, Gilbank could not sue on T.E.H.'s behalf, App.25; R.41:9; (2) all claims related to the two state-court judges on Eleventh Amendment and judicial-immunity grounds, App.25–26; R.41:9–10; (3) all claims against the Wood County Department of Human Services on the grounds that the Department is not a separate entity subject to suit, *id.*; (4) the 42 U.S.C. § 1986 claims as untimely, App.27–28; R.41:11–12; and (5) all claims against Children's Hospital for failure to state a claim, *id.* Gilbank does not appeal rulings (1)–(5) described immediately prior. Finally, although not entirely clear, the district court appears to have dismissed Gilbank's 42 U.S.C. § 1985 conspiracy claims as untimely. *See* App.27; R.41:11. To the

extent the district court did so, Gilbank appeals that aspect of the motion-to-dismiss order.

All remaining parties then filed cross-motions for summary judgment. App.16; R.131:15. The district court denied Gilbank's motion and granted the defendants' motions. *Id.* The court concluded that it lacked subject-matter jurisdiction over Gilbank's claims under the *Rooker-Feldman* doctrine. App.11–12, 16; R.131:11-12, 15. In addition, after concluding it lacked subject-matter jurisdiction, the district court went on to state that, even if it hypothetically had jurisdiction, it would still rule against Gilbank on the merits. App.14, 16; R.131:13, 15. Gilbank appeals the district court's summary-judgment order in its entirety.

## STANDARD OF REVIEW

All aspects of Gilbank's appeal are subject to *de novo* review. First, this Court "review[s] de novo a district court's order granting a Rule 12(b)(6) motion to dismiss based on the statute of limitations," accepting "all well-pleaded allegations of the complaint as true and view[ing] them in the light most favorable to [Gilbank]." *Indep. Tr. Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 934 (7th Cir. 2012) (quoting *Santiago v. Walls*, 599 F.3d 749, 756 (7th Cir. 2010)). Second, this Court reviews the district court's "summary-judgment order de novo, construing the record in the light most favorable to [Gilbank] and drawing all reasonable inferences in [her] favor." *James v. Hale*, 959 F.3d 307, 314 (7th Cir. 2020). Specifically, this Court "review[s] *de novo* the district court's decision that it lacks subject-matter jurisdiction under the *Rooker-Feldman* doctrine." *Andrade v. City of Hammond, Ind.*, 9 F.4th

947, 949 (7th Cir. 2021) (citing *Brokaw v. Weaver*, 305 F.3d 660, 664 (7th Cir. 2002)).

## SUMMARY OF ARGUMENT

I.   Gilbank timely brought her 42 U.S.C. § 1985 claims. In its motion-to-dismiss order, the district court "dismiss[ed] Gilbank's *conspiracy* claims" as untimely. App.27; R.41:11 (emphasis added). To the extent the district court was referring to Gilbank's conspiracy claims under § 1985, it erred. Gilbank filed her § 1985 conspiracy claims well within the applicable three-year limitations period.

II. The district court incorrectly concluded that it lacked subject-matter jurisdiction under *Rooker-Feldman*. That doctrine—an exceedingly narrow jurisdictional rule grounded in statutory language, *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 291–92 (2005)—divests jurisdiction and bars claims only when *all three* of the following questions are answered in the affirmative:

- Does the federal plaintiff's claim directly challenge the state-court judgment?

- Is the federal plaintiff's claim inextricably intertwined with the state-court judgment?

- Did the federal plaintiff have a reasonable opportunity to raise the issues in the state-court proceedings?

In this case, the answer to *all three* questions is "no."

First, Gilbank's claims do not directly challenge a state-court judgment. To decide whether a claim directly challenges a state-court judgment, courts focus on the relief requested from the federal court. Here, the state court adjudicated custody, not monetary relief; in federal court, Gilbank seeks monetary relief, not a custody

11

adjudication. Indeed, Gilbank has no reason to ask the federal court to reverse the state court's order removing T.E.H. from her custody: Gilbank has *regained custody* of T.E.H. Multiple courts have faced similar factual circumstances and held that plaintiffs like Gilbank were not challenging a state-court judgment for *Rooker-Feldman* purposes. In reaching the opposite conclusion, the district court mistakenly conflated *Rooker-Feldman* with more generalized preclusion principles. This was error.

Second, Gilbank's claims are not inextricably intertwined with a state-court judgment. The "inextricably intertwined" analysis focuses on *causation* and *injury*; claims are inextricably intertwined only if there is "*no way* for the injury complained of . . . to be separated from the state court judgment." *Andrade*, 9 F.4th at 950 (cleaned up) (emphasis added). Here, some of Gilbank's claims—for unlawful search (the urine sample); unlawful seizure of T.E.H. (without legal basis and without warrant or court order, and associated due-process violations); unlawful denial of an attorney during interrogation; and *Monell* claims based on related conduct—concern "conduct" that "occurred before any judicial involvement." *Id.* Other of her claims—due-process claims for "pursuing the CHIPS petition based on false and incomplete information about Gilbank and Hoyle" and "failing to give Gilbank adequate notice and an opportunity to be heard regarding T.E.H.'s placement," *see supra* pp. 8–9—concern conduct that occurred *during* state-court proceedings. Neither set of claims, in other words, complains of injury *caused by* the state-court judgment

12

itself. Gilbank's claims instead assert injury caused by the defendants' conduct separate from the judgment.

Third, Gilbank lacked a reasonable opportunity to raise her claims in state court. In multiple cases, this Court has held that a federal plaintiff was without a reasonable opportunity where controlling state-court procedures erected a barrier the plaintiff was "incapable of overcoming in order to present certain claims to the state court." *Long v. Shorebank Dev. Corp.*, 182 F.3d 548, 558 (7th Cir. 1999). Similar to those cases, the state-court CHIPS proceeding here involved a jurisdictionally-limited scope of inquiry, effectively barring Gilbank from raising issues she raises now in any meaningful way. So too did the CHIPS proceeding require Gilbank and the state court to take certain actions within strict, mandatory timeframes inadequate for a party to investigate, pursue, and litigate claims like Gilbank's here.

In sum, Gilbank does not directly challenge a state-court judgment. She does not complain of injury caused by (i.e., inextricably intertwined with) a state-court judgment. And in any event, she lacked a reasonable opportunity to raise her claims in state court. For any of these reasons independently, and for all of them together, *Rooker-Feldman* does not apply, and the district court had subject-matter jurisdiction.

III. If this Court reverses the district court's *Rooker-Feldman* ruling, it should remand for consideration of all other issues—both of other threshold issues and on the merits.

First, defendants on appeal may contend that Gilbank's claims fail on other threshold grounds, such as preclusion or qualified immunity. Yet as to all the remaining defendants, the district court has not yet weighed in on those issues. Circuit courts, including this Court, "ordinarily" do not decide questions the district court "failed to decide." *Sharp v. Ford Motor Credit Co.*, 615 F.2d 423, 424 n.1 (7th Cir. 1980). Indeed, when reversing a district court's dismissal on *Rooker-Feldman* grounds, circuit courts commonly remand for consideration of other threshold issues. *E.g.*, *Arnold v. KJD Real Est., LLC*, 752 F.3d 700, 708 (7th Cir. 2014). The Court should adhere to its ordinary, common practice.

Second and likewise, the Court should refrain from wading into the merits—despite the district court's extrajurisdictional foray to the contrary. After determining (erroneously) that it lacked subject-matter jurisdiction under *Rooker-Feldman* to adjudicate Gilbank's claims, the district court nevertheless proceeded to opine on the merits of those very same claims. Yet to do so, the district court "*assume[d]* jurisdiction for the purpose of deciding the merits of the case." *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007) (emphasis added). Long-rejected by the Supreme Court, this exercise of so-called "hypothetical jurisdiction" produced an opinion on the merits both advisory and unreviewable.

The Court should reverse the judgment below and remand for further proceedings consistent with this Court's decision.

# ARGUMENT

## I. The district court erred to the extent it dismissed Gilbank's 42 U.S.C. § 1985 claims as untimely.

In her amended complaint, Gilbank brought claims under 42 U.S.C. §§ 1983, 1985, and 1986. *See* App.34, 43–44; R.6:6, 15–16. Section 1983 creates a cause of action for deprivation of federal rights; § 1985 creates a cause of action for conspiracy to deprive federal rights; and § 1986 creates a cause of action for neglect to prevent a § 1985 conspiracy.

The limitations period for § 1985 claims is derived from state law. *Hoagland v. Town of Clear Lake, Ind.*, 415 F.3d 693, 700 (7th Cir. 2005). Here, Wisconsin's relevant limitations period for personal-injury claims is three years. Wis. Stat. § 893.54(1m). By contrast, the limitations period for § 1986 claims is one year. *Hoagland*, 415 F.3d at 700.

In its motion-to-dismiss order, the district court "agree[d] with defendants" that Gilbank's "§ 1986 claims are untimely." App.27; R.41:11. Gilbank does not challenge this conclusion: although the conduct giving rise to her claims occurred primarily in 2018, she did not file her initial complaint until over a year later in June 2020. App.27; R.41:11.

The district court, however, also stated it was "dismiss[ing] Gilbank's *conspiracy* claims" as untimely. App.27; R.41:11 (emphasis added). But conspiracy claims arise under § 1985—not § 1986. It is unclear whether the district court intended to dismiss both Gilbank's § 1985 conspiracy claims and her § 1986 neglect-to-prevent claims, or whether it inadvertently conflated them. To the extent it dismissed Gil-

bank's § 1985 conspiracy claims, the district court was wrong. Gilbank filed her § 1985 conspiracy claims well within the applicable three-year limitations period.

## II. The district court had subject-matter jurisdiction, because *Rooker-Feldman* does not bar Gilbank's claims.

The district court ruled that it lacked subject-matter jurisdiction under the *Rooker-Feldman* doctrine. Yet in doing so, the court overextended *Rooker-Feldman* beyond its properly narrow boundaries. Because Gilbank's claims do not fall within the ambit of *Rooker-Feldman*, the district court had subject-matter jurisdiction.

### A. *Rooker-Feldman* is an exceedingly narrow jurisdictional rule—and nothing more.

The U.S. Constitution creates the U.S. Supreme Court and authorizes Congress to create inferior courts. *See* U.S. Const. Art. III § 1. By statute, Congress has given the Supreme Court jurisdiction to hear appeals from state courts of last resort. 28 U.S.C. § 1257. Although Congress has also created inferior trial and appellate courts, it has not explicitly authorized those courts to hear appeals of state-court judgments. From Congress' omission arises a negative inference that inferior federal courts lack subject-matter jurisdiction over appeals from state courts. *See Exxon*, 544 U.S. at 291–92; *Andrade*, 9 F.4th at 951 (Sykes, C.J., concurring); *Behr v. Campbell*, 8 F.4th 1206, 1210, 1213 (11th Cir. 2021); *see also Arnold*, 752 F.3d at 702 ("The *Rooker–Feldman* doctrine rests on the fact that only the Supreme Court of the United States has appellate jurisdiction over state court decisions . . . ."). *See*

*generally* 21 C.J.S. Courts § 283. Owing to its two foundational cases,[3] this negative inference bears the name the "*Rooker-Feldman* doctrine."

For a few decades post-*Feldman*, lower courts "inflated" the doctrine, *Behr*, 8 F.4th at 1209, "extend[ing] [it] far beyond" its roots in statutory text and Supreme Court precedent, *Exxon*, 544 U.S. at 283. "*Rooker-Feldman* developed into an inscrutable abstention doctrine, an untethered way for federal courts to defer to state court litigation of related cases and controversies and a new way to avoid deciding federal questions." *VanderKodde v. Mary Jane M. Elliott, P.C.*, 951 F.3d 397, 406 (6th Cir. 2020) (Sutton, C.J., concurring); *see also Andrade*, 9 F.4th at 952 (Sykes, C.J., concurring) (documenting evolution of *Rooker-Feldman*). Under its guise, lower federal courts regularly dismissed claims and cases for reasons more accurately described as preclusion, abstention, comity, or prudence.

Then in 2005, the Supreme Court returned *Rooker-Feldman* to its conceptual foundation. *See Exxon*, 544 U.S. 280. Specifically, the Court "confined" the doctrine to "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon*, 544 U.S. at 284; *see VanderKodde*, 951 F.3d at 399–400. Although lower courts have generally heeded the Supreme Court's *Exxon* directive and reined in *Rooker-Feldman*, the doctrine at times "continues to be applied outside its carefully circumscribed boundaries." *Andrade*, 9 F.4th at 951 (Sykes, C.J., concurring); *Behr*, 8 F.4th at 1211 ("Unfortunate-

---

[3] *Rooker v. Fidelity Tr. Co.*, 263 U.S. 413 (1923); *Dist. of Columbia Ct. of Appeals v. Feldman*, 460 U.S. 462 (1983).

ly, litigants and the district courts have still not gotten the message."); *Vander-Kodde*, 951 F.3d at 405 (Sutton, C.J., concurring) ("*Rooker-Feldman* is back to its old tricks of interfering with efforts to vindicate federal rights and misleading federal courts into thinking they have no jurisdiction over cases Congress empowered them to decide.").

As the Court in *Exxon* made clear, *Rooker-Feldman* is not a doctrine of preclusion, abstention, comity, or prudence. *Exxon*, 544 U.S. at 284, 292–93; *see Andrade*, 9 F.4th at 950 (contrasting *Rooker-Feldman* with doctrines of preclusion, abstention, and comity); *Behr*, 8 F.4th at 1210 (same); *cf. Target Media Partners v. Specialty Mktg. Corp.*, 881 F.3d 1279, 1292 (11th Cir. 2018) (Newsom, J., concurring) (criticizing erroneous *Rooker-Feldman* cases for improperly "jurisdictionaliz[ing]" and "federaliz[ing]" preclusion doctrines (internal citations omitted)). Nor does the doctrine "kick in whenever a state court has considered the same or similar issues raised in the federal lawsuit." *Andrade*, 9 F.4th at 952 (Sykes, C.J., concurring).

Indeed, *Rooker-Feldman* is a parsimonious rule about subject-matter jurisdiction—and nothing more. It places "[o]nly a narrow segment of cases . . . outside the jurisdiction of the lower federal courts." *Andrade*, 9 F.4th at 950; *see Exxon*, 544 U.S. at 284 (stating that *Rooker–Feldman* "occupie[s]" "narrow ground"); *Behr*, 8 F.4th at 1208, 1214 ("*Rooker-Feldman* is a narrow jurisdictional doctrine."); *VanderKodde*, 951 F.3d at 399–400 (observing that *Rooker-Feldman* "applies only to an exceedingly narrow set of cases"). To that end, "the application of *Rooker-Feldman*'s jurisdictional bar should not be a court's first instinct when a federal lawsuit over-

laps with earlier state litigation." *Andrade*, 9 F.4th at 951 (Sykes, C.J., concurring); *accord Behr*, 8 F.4th at 1212 ("In short, district courts should keep one thing in mind when *Rooker-Feldman* is raised: it will almost never apply."). Instead, "[a]bsent a claim seeking review of a final state-court judgment, a federal court tempted to dismiss a case under *Rooker-Feldman* should do one thing: Stop." *VanderKodde*, 951 F.3d at 409 (Sutton, C.J., concurring).

### B. *Exxon* and this Court's caselaw teach that *Rooker-Feldman* does not bar "independent" federal claims.

Expounding on the *Rooker-Feldman* doctrine in *Exxon*, the Supreme Court held that lower federal courts lack jurisdiction over "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon*, 544 U.S. at 284. This holding clarifies that *Rooker-Feldman* applies only when four elements are met:

- The federal plaintiff lost in state court;

- The state court rendered judgment before the plaintiff commenced federal proceedings;

- The plaintiff alleges injury caused by the state-court judgment; *and*

- The plaintiff invites review and rejection of the state-court judgment.

Following *Exxon*, some courts have wholesale adopted this four-element framework. *See, e.g.*, *Green v. Mattingly*, 585 F.3d 97, 101 (2d Cir. 2009) (recognizing that, after *Exxon*, "there are four requirements that must be met before the *Rooker–Feldman* doctrine applies" (internal quotation marks omitted)).

19

The Seventh Circuit, for its part, has continued to use pre-*Exxon* language in its post-*Exxon* decisions. In one recent case, for example, this Court articulated a "two-step analysis." *Andrade*, 9 F.4th at 950.

*First*, the Court "consider[s] whether a plaintiff's federal claims are independent"—on the one hand—"or, instead, whether they either directly challenge a state-court judgment or are inextricably intertwined with one"—on the other hand. *Id.* (quoting *Swartz v. Heartland Equine Rescue*, 940 F.3d 387, 391 (7th Cir. 2019)) (internal quotation marks omitted). "Inextricably intertwined," in turn, means "there must be no way for the injury complained of by the plaintiff to be separated from the state court judgment." *Id.* (quoting *Jakupovic v. Curran*, 850 F.3d 898, 903 (7th Cir. 2017)) (cleaned up). If the plaintiff's claims are "independent"—that is, they neither "directly challenge" nor are "inextricably intertwined with" a state-court judgment—then *Rooker-Feldman* does not apply and the analysis ends.

*Second*, if the federal plaintiff's claims are *not* independent, the Court then asks "whether the plaintiff had a reasonable opportunity to raise the [now-federal] issue in state court proceedings." *Id.* (quoting *Jakupovic*, 850 F.3d at 902). If the plaintiff lacked such an opportunity, then *Rooker-Feldman* does not apply. But if the plaintiff did have a reasonable opportunity, then the federal court lacks subject-matter jurisdiction. *See id.*

Although not a perfect parallel, the Seventh Circuit's "independence" test (the first step) bears strong resemblance to the Supreme Court's test in *Exxon*. Indeed, both tests include similar language framed in terms of injury and relief:

20

|  | ***Exxon*** (U.S.) | ***Andrade*** (7th Cir.) |
|---|---|---|
| **Injury** | "complaining of injuries caused by [a] state-court judgment[ ]" | "inextricably intertwined" with a state-court judgment, meaning "there [is] no way for the injury complained of . . . to be separated from the state court judgment" |
| **Relief** | "invit[e] [federal] review and rejection of [a state-court] judgment[ ]" | "directly challenge a state court judgment" |

Despite these similarities, at least one point of tension persists. Under *Exxon*, *Rooker-Feldman* applies only to claims that meet *both* the injury *and* relief elements. Under the Seventh Circuit's test, however, claims are not "independent" if they either "directly challenge" or are "inextricably intertwined" with a state-court judgment. That test, in other words, envisions *Rooker-Feldman* as applying to claims that meet *either* the injury *or* relief elements. (Setting aside the subsequent "reasonable opportunity" second step.)

Addressing this tension, Chief Judge Sykes recently called upon this Court to dispense with the "inextricably intertwined" language and bring its "test in line with *Exxon*'s teachings." *Andrade*, 9 F.4th at 954 (Sykes, C.J., concurring). She noted, in fact, that recent panels of this Court have vacillated between perpetuating and rejecting the "inextricably intertwined" language. *Andrade*, 9 F.4th at 954 (Sykes, C.J., concurring); *compare, e.g.*, *Milchtein v. Chisholm*, 880 F.3d 895, 898 (7th Cir. 2018); *Iqbal v. Patel*, 780 F.3d 728, 730 (7th Cir. 2015); *and Richardson v. Koch L. Firm, P.C.*, 768 F.3d 732, 734 (7th Cir. 2014) (rejecting the inextricably-intertwined test), *with, e.g.*, *Swartz*, 940 F.3d at 388; *Jakupovic*, 850 F.3d at 902; *and Sykes v. Cook Cnty. Cir. Ct. Prob. Div.*, 837 F.3d 736, 742 (7th Cir. 2016) (using

"inextricably intertwined"). Gilbank supports abandoning the "inextricably inter-twined" language in favor of following the Supreme Court's specific language from *Exxon*.

Short of abandoning "inextricably intertwined," though, the Court must still en-sure that its *Rooker-Feldman* test aligns with *Exxon*. To that end, the Court should interpret its "independence" test (from cases like *Andrade*) in the conjunctive: for *Rooker-Feldman* to apply, the federal plaintiff's claims must *both* "directly chal-lenge" ("invite review and rejection of") *and* be "inextricably intertwined with" ("complain[ ] of injuries caused by") the state-court judgment. Interpreting the test disjunctively—or interpreting "inextricably intertwined" to authorize inquiry be-yond injury—would conflict with Supreme Court precedent. *See* Allison B. Jones, *The Rooker-Feldman Doctrine: What Does It Mean to Be Inextricably Intertwined?*, 56 Duke L.J. 643, 667–69, 678 (2006) (arguing that, to the extent "inextricably in-tertwined" can co-exist with *Exxon*, it must be a narrow injury-focused inquiry); *see also Behr*, 8 F.4th at 1212 (similar); *Kovacic v. Cuyahoga Cnty. Dep't of Child. & Fam. Servs.*, 606 F.3d 301, 310 (6th Cir. 2010) (similar).

In sum, a harmonized reading of the Supreme Court's and this Court's caselaw can produce a coherent—if not always straightforward—test. Specifically, when a plaintiff commences federal proceedings after losing in state court (as Gilbank did here), a federal court faces three questions:

- Does the federal plaintiff's claim directly challenge the state-court judgment?

- Is the federal plaintiff's claim inextricably intertwined with the state-court judgment?

- Did the federal plaintiff have a reasonable opportunity to raise the issues in the state-court proceedings?

For *Rooker-Feldman* to apply, all three questions must be answered in the affirmative. If any one question is answered in the negative, then *Rooker-Feldman* does not apply, and the federal court has subject-matter jurisdiction. Here, the answer to *all three* questions is "no."

### C. Gilbank's claims are "independent," because they do not "directly challenge" the state-court judgment.

As explained, a federal court facing a *Rooker-Feldman* argument first asks whether the plaintiff's claim "directly challenge[s]," *Andrade*, 9 F.4th at 950—or, "invite[s] . . . review and rejection of," *Exxon*, 544 U.S. at 284—a state-court judgment. If the plaintiff's claims do not directly challenge the state-court judgment, then the analysis ends, *Rooker-Feldman* does not apply, and the court has subject-matter jurisdiction.[4]

---

[4] Because *Rooker-Feldman* is about subject-matter jurisdiction, the Court should determine its applicability exclusively—or, at least, primarily—based on Gilbank's amended complaint and the other pleadings-stage materials. *See* Howard M. Wasserman, *Jurisdiction and Merits*, 80 Wash. L. Rev. 643, 701 (2005) ("[T]he 'arising under' (or 'brought under' or 'commenced to redress a deprivation of') jurisdictional grants do not ask historical factual questions. They ask only for a prediction from the court: Does it appear (based solely on the pleadings) that the plaintiff seeks relief created or made possible by a federal enactment?" (footnotes omitted)).

Moreover, because Gilbank filed all of her papers in the district court *pro se*, the Court should view them with "heightened judicial solicitude." *Philos Techs., Inc. v. Philos & D, Inc.*, 645 F.3d 851, 858 (7th Cir. 2011); *see id.* ("It has long been established that *pro se* filings are held to less stringent standards than formal pleadings drafted by lawyers, with the primary goal being to give *pro se* filings fair and meaningful consideration." (cleaned up)).

**1.** Here, Gilbank does not directly challenge the state-court judgment. The state-court judgment determined custody of T.E.H. Neither in form nor function do Gilbank's claims seek to undo that determination. Indeed, she would have no reason to: both today and at the time she filed this lawsuit, she had already *regained custody* of T.E.H.

True enough, some of the issues Gilbank raises in federal court may overlap with issues raised in the state-court custody proceedings. The district court seized on this below, reasoning that "a finding in Gilbank's favor" on her federal claims "would contradict the state court's orders." App.13; R.131:12. But any such "contradict[ion]" does not alone trigger *Rooker-Feldman*. In no uncertain terms, the Supreme Court and this Court have long held that subject-matter jurisdiction exists so long as a federal plaintiff "present[s] some independent claim," even if it is "one that denies a legal conclusion that a state court has reached." *Exxon*, 544 U.S. at 293 (quoting *GASH Assocs. v. Vill. of Rosemont*, 995 F.2d 726, 728 (7th Cir. 1993)) (alteration in original); *accord Brokaw*, 305 F.3d at 666 (quoting *Long*, 182 F.3d at 555–56) ("[T]he fact that the plaintiff's pursuit of [her] federal claims could ultimately show that the state court judgment was erroneous [does] not automatically make *Rooker–Feldman* applicable." (alteration in original)).

Instead, to decide whether a claim directly challenges a state-court judgment, courts focus on the relief requested from the federal court. *See VanderKodde*, 951 F.3d at 402 ("A court cannot determine the source of the injury without reference to the plaintiff's request for relief." (cleaned up)). More specifically, "[b]ecause *Rooker-*

*Feldman* bars only claims that invite a district court's review and rejection of a state court judgment, claims that seek only damages for constitutional violations of third parties—not relief from the judgment of the state court—are permitted." *Behr*, 8 F.4th at 1214 (internal quotation marks omitted); *see also, e.g.*, *Loubser v. Thacker*, 440 F.3d 439, 442 (7th Cir. 2006) (holding that *Rooker-Feldman* did not bar federal claims of conspiracy to corrupt state-court divorce proceedings, because "the relief [plaintiff] [sought] [went] far beyond merely modifying the division of property decreed by the divorce court," and included "damages").

In federal court, Gilbank seeks monetary damages for past constitutional violations. *See* App.29–51; R.6. By contrast, no monetary damages were in play in state court. From a remedial perspective, the state-court proceedings involved only determinations about Gilbank's custody of T.E.H. and the best interests of T.E.H. That distinction—between a state-court order deciding *custody and the best interests of the child* (but not damages), and federal claims seeking *damages* (but not any decision about custody or the child's best interests)—has proven pivotal in several *Rooker-Feldman* cases that are instructive here.

*Behr* is highly illustrative. 8 F.4th 1206. In that case, a father lost custody of two children in state-court proceedings. *Id.* at 1208–09. He and his two other children then sued several defendants in federal court, claiming they violated their federal due-process and Fourth Amendment rights. *Id.* at 1209. The district court dismissed on *Rooker-Feldman* grounds, but the Eleventh Circuit reversed. The latter court homed in on the relief sought. Regarding due process, the plaintiffs alleged that the

defendants "use[d] falsified and/or coerced information as a basis for the [state-court] proceedings and decisions" and "restrict[ed] [their] access to the courts and deni[ed] [them] adequate legal counsel." *Id.* at 1213. Critically, the plaintiffs "[did] not raise these constitutional claims to undo the state court's child custody decision." *Id.* They rather asked the federal court "to consider whether their constitutional rights were violated during the proceedings and whether they are entitled to damages for those violations." *Id.* Similarly with the Fourth Amendment claim, the plaintiffs "ask[ed] only for damages"—not for any "appeal or undo [of the] state court judgment." *Id.* Because the plaintiffs sought only damages—not review and rejection of the state-court custody order—their constitutional claims "survive[d] *Rooker-Feldman.*" *Id.*

Like *Behr*, so too do *Brokaw*, *Kovacic*, *Green*, *Holloway*, *Ernst*, and others feature a state-court order removing a child from the parent's custody and a later federal suit claiming that aspects of the removal and custody proceedings violated the U.S. Constitution. In all those cases, the state court decided custody but did not entertain any damages requests; the federal court faced damages requests, but not requests to alter a custody decision. And in all those cases, federal circuit courts rejected *Rooker-Feldman*, because the plaintiffs were not seeking review and rejection of a state-court judgment. *See Kovacic*, 606 F.3d at 310 (rejecting *Rooker-Feldman*'s applicability where federal claims sought monetary damages from agency involved in removal of child, but "[did] not seek review or reversal of the decision of the juvenile court to award temporary custody to the state"); *Green*, 585 F.3d at 101–03

(similar); *Brokaw*, 305 F.3d at 665–66 (similar); *Holloway v. Brush*, 220 F.3d 767, 779 (6th Cir. 2000) (en banc) (cited favorably in *Brokaw*, 305 F.3d at 665–66) (similar); *Ernst v. Child & Youth Servs. of Chester Cnty.*, 108 F.3d 486, 491–92 (3d Cir. 1997) (cited favorably in *Brokaw*, 305 F.3d at 665–66) (similar); *see also Royal v. Payne*, No. 22-1184, 2022 WL 4008718, at *1 (7th Cir. Sept. 2, 2022) (declining to apply *Rooker-Feldman* to bar mother's claim for "damages for what she regards as the defendants' independently unlawful conduct—their interference with her Fourteenth Amendment rights to care for and control her children"); *Sanders v. Ind. Dep't of Child Servs.*, 806 Fed. App'x 478, 481 (7th Cir. 2020) (similar).

Distinctions between federal and state relief are starkest when—like here—any potential for overlap is moot. In *Green*, for example, a state court entered an order removing a child from the mother's custody. *See* 585 F.3d at 99–100. That court then entered another order returning the child to the mother. *Id.* The mother later filed a lawsuit in federal court, claiming that multiple defendants violated her federal constitutional rights by "making false statements to the [state court]," "petitioning for the removal of [the child] without probable cause," and engaging in malicious prosecution, among other things. *Id.* at 100. Rejecting a *Rooker-Feldman* argument, the Second Circuit reasoned that the mother's claims did not "invite district court review and rejection" because the child had already "been returned to [the mother]." *Id.* at 102; *see also Kovacic*, 606 F.3d at 310 ("[The children, in federal court] seek compensatory damages for alleged unconstitutional conduct by a government agency, not injunctive or other equitable relief, because any action concern-

ing their return to their mother's custody became moot when they were reunited with their mother . . . ."). "The situation would have been different," however, "if the [state court] had entered a final order of disposition permanently removing plaintiff's child from her custody and plaintiff had brought this action seeking the return of her child." *Green*, 585 F.3d at 103 (emphasis added). Just like in *Green*, so too here: Gilbank *has not* "brought this action *seeking the return of [T.E.H.].*" *Id.* (emphasis added).[5]

Because she does not ask for anything but monetary damages in federal court, Gilbank does not "invite[ ] review and rejection of," *Exxon*, 544 U.S. at 284, or "directly challenge[ ]," *Andrade*, 9 F.4th at 950, the state-court judgment. Accordingly, her claims are independent. *Rooker-Feldman* does not apply, and the district court has subject-matter jurisdiction.

**2.** As explained above, *Rooker-Feldman* differs from preclusion. *See supra* pp. 17–18; *see also Exxon*, 544 U.S. at 284, 292–93; *Andrade*, 9 F.4th at 950 (contrasting *Rooker-Feldman* with doctrines of preclusion, abstention, and comity); *Behr*, 8 F.4th at 1210 (same). And "[t]he doctrine thus does not kick in whenever a state court has considered the same or similar issues raised in the federal lawsuit." *Andrade*, 9 F.4th at 952 (Sykes, C.J., concurring).

---

[5] To be sure, this case does not perfectly align with *Green*. Most notably, in *Green*, the child was removed and returned in the *same* state-court proceeding. Here, T.E.H. was removed in one state-court proceeding and returned to Gilbank in a separate proceeding. Although that difference might matter for other aspects of a *Rooker-Feldman* analysis (such as what the relevant "judgment" is), it does not undermine the critical point here. Regardless of how or when, Gilbank has custody of T.E.H., and it would make no sense for her to ask this Court to change any aspect of custody.

The district court below erroneously conflated *Rooker-Feldman* with preclusion principles. It stated, for instance, that

> the juvenile court considered Gilbank's claims that T.E.H. was seized without probable cause and was not in need of protection. The state court heard the arguments, weighed the evidence, determined credibility, and found probable cause that T.E.H. was in need of protection. The court considered and approved the requirements of the CHIPS petition regarding T.E.H.'s placement and Gilbank's visitation rights. The Rooker-Feldman doctrine prohibits this court from reviewing those orders or to issue a decision that would undermine the validity of those orders.

App.12; R.131:11.

The district court does not—nor could it—suggest that Gilbank's claims in federal court seek to change the outcome of the state-court judgment. As mentioned, Gilbank has not asked the federal court to change the state-court outcome from "no custody" to "custody." Rather, what the district court describes in this paragraph appears to be preclusion. It notes that another court—the state juvenile court— "heard the arguments, weighed the evidence, determined credibility, and found probable cause." The district court suggests that *it* cannot now review or question the validity of those arguments, re-weigh that evidence, re-determine credibility, or make a finding about probable cause. Whatever the merits of that reasoning as a matter of *preclusion*, it has nothing to do with *Rooker-Feldman*. The fact that the state court considered certain issues in *reaching its judgment*, and Gilbank now (maybe) raises the same or similar issues here, is at best an issue of preclusion to be evaluated on the merits. It is not a question of jurisdiction under *Rooker-Feldman*.

**D. Gilbank's claims also are "independent," because they are not "inextricably intertwined" with the state-court judgment.**

Here, because Gilbank does not "directly challenge" ("seek review and rejection of") the state-court judgment, *Rooker-Feldman* does not apply, and this Court's analysis ends. If the Court disagrees, however, it next "consider[s] whether a plaintiff's federal claims . . . are inextricably intertwined with" the state-court judgment. *Andrade*, 9 F.4th at 950 (citation omitted). The "inextricably intertwined" analysis focuses—as it must, *see supra* pp. 21–23—on *causation* and *injury*. According to Supreme Court precedent, *Rooker-Feldman* extends no further than to claims arising from "injuries caused by state-court judgments." *Exxon*, 544 U.S. at 284; *see Behr*, 8 F.4th at 1212 ("The injury must be caused by the judgment itself. Period."). The test is strict: claims are inextricably intertwined only if there is "*no way* for the injury complained of . . . to be separated from the state court judgment." *Andrade*, 9 F.4th at 950 (cleaned up) (emphasis added). Here, Gilbank does not complain of injuries caused by—and therefore her claims are not inextricably intertwined with—the state-court judgment.

**1.** To begin, Gilbank brings claims for unlawful search (the urine sample); unlawful seizure of T.E.H. (without legal basis and without warrant or court order); and associated due-process violations; unlawful denial of an attorney during interrogation; and *Monell* claims based on related conduct. *See supra* pp. 8–9. As to these claims, the "conduct" Gilbank "challenge[s]" "occurred before any judicial involvement." *Andrade*, 9 F.4th at 950. Gilbank, in other words, claims her constitutional

rights were violated before state-court proceedings even *began*—much less culmi-nated in a judgment.

This Court confronted similar claims in *Brokaw*, where two children were re-moved from their parents' home, after which a state court adjudicated them wards of the state. *Brokaw*, 305 F.3d at 662–63. Once adults, the children brought a feder-al suit alleging "federal constitutional claims against the various individuals in-volved in instigating, investigating, directing, or overseeing the removal of [them] from their parents." *Id.* at 663. The female child, this Court observed, was "not merely claiming that the decision of the state court was incorrect or that the deci-sion violated her constitutional rights." *Id.* at 665. She was rather "alleging that the people involved in the decision to forcibly remove her from her home and her par-ents and subject her to the custody of the [state] violated her constitutional rights, independently of the state court decision." *Id. Rooker-Feldman* therefore did not ap-ply. *Id.*

Similarly in *Behr*, another child-custody case, "the Behrs allege[d] a violation of their Fourth Amendment rights, claiming that the Palm Beach County Department of Children and Families and its investigator, as well as other, unidentified, de-fendants, entered [their] home without permission and under false pretenses." 8 F.4th at 1213. The Eleventh Circuit concluded that the Behrs were not complaining of injury caused by a state-court judgment. *See id.*; *see also Kovacic*, 606 F.3d at 303, 310 (holding that *Rooker-Feldman* did not apply to similar claims, where "[t]he conduct complained of primarily consist[ed] of Family Services' alleged failure to

undertake an independent review of the situation," and failure to obtain a warrant, "before removing the children from the home and triggering the Juvenile Court proceedings based on . . . uncorroborated and unverified information"). Just the same here, because they "could exist even without *any* state-court judgment," *Andrade*, 9 F.4th at 951 (emphasis in original), Gilbank's claims do not complain of "injuries caused by [a] state-court judgment[ ]," *Exxon*, 544 U.S. at 284.

Moving on, Gilbank brings due-process claims for "pursuing the CHIPS petition based on false and incomplete information about Gilbank and Hoyle" and "failing to give Gilbank adequate notice and an opportunity to be heard regarding T.E.H.'s placement." *See supra* pp. 8–9. In other words, Gilbank alleges that certain defendants committed unlawful acts *during* the state-court proceedings that, in turn, contributed to a state-court judgment. Yet the injuries she complains of were caused by the defendants' unlawful acts—not the "judgment itself." *Behr*, 8 F.4th at 1212. Gilbank's claims thus resemble the due-process claims in *Behr*, where the plaintiffs alleged that the defendants "use[d] falsified and/or coerced information as a basis for the [state-court] proceedings and decisions" and "restrict[ed] [their] access to the courts and deni[ed] [them] adequate legal counsel." *Id.* at 1214. Because the plaintiffs alleged injuries caused by the defendants' conduct "during the proceedings"— and not caused by the judgment itself—their claims "[fell] outside *Rooker-Feldman*'s boundaries." *Id.* at 1213; *see also Kovacic*, 606 F.3d at 310 (holding that *Rooker-Feldman* did not apply to claims that "focus[ed] on the conduct of Family Services and of the social workers *that led up to* the juvenile court's decision to award tempo-

rary custody to the County" (emphasis in original)). Similarly, when a "plaintiff claimed he 'was injured by [the defendant] when [the defendant] filed a false affidavit [in court],'" the Sixth Circuit had no trouble concluding that *Rooker-Feldman* did not apply because "the plaintiff's injuries stemmed from the defendant's conduct, not the state-court judgment." *VanderKodde*, 951 F.3d at 403 (quoting *Todd v. Weltman, Weinberg & Reis Co., L.P.A.*, 434 F.3d 432, 437 (6th Cir. 2006)) (alteration in original). The same is true here.

Finally, Gilbank claims that multiple defendants (and others) conspired together. *See supra* pp. 8–9. This Court has previously held that conspiracy claims—even when the conspiracy takes place in part or in whole during the state-court proceedings—survive *Rooker-Feldman*, when the conspiracy *resulted in* the state-court *judgment* at issue. *See Loubser*, 440 F.3d at 440–42 (holding that *Rooker-Feldman* did not bar claims against several defendants who allegedly conspired to corrupt state-court proceedings that *resulted* in divorce judgment).[6]

**2.** These causation-based grounds for rejecting the applicability of *Rooker-Feldman* distinguish this case from cases where this Court has found *Rooker-Feldman* applicable, such as *Bauer* and *Swartz. Bauer v. Koester*, 951 F.3d 863 (7th

---

[6] *Cf. Zurich Am. Ins. Co. v. Superior Ct. for the State of Cal.*, 326 F.3d 816, 822 (7th Cir. 2003) ("[Plaintiff's] injury was not caused by the state court, but by its adversary's conduct. . . . [Plaintiff's] federal claim simply seeks to bypass the state court's order, and does not directly attack it, so *Rooker–Feldman* does not apply."); *Gbur v. City of Harvey, Ill.*, 835 F. Supp. 2d 600, 618 (N.D. Ill. 2011), *on reconsideration in part* (Mar. 9, 2012) (holding that *Rooker-Feldman* did not bar plaintiffs' claims, where plaintiff was "not complaining that the state court rulings caused him harm; it was his adversary's conduct that injured him").

Cir. 2020) (per curiam); *Swartz*, 940 F.3d 387.[7] In both of those cases, *Rooker-Feldman* applied because the federal plaintiffs were complaining of injuries "caused by the judgment[s] [themselves]." *Behr*, 8 F.4th at 1212.

In *Bauer*, a state court entered a foreclosure judgment and related orders against the Bauers. 951 F.3d at 865. The foreclosure plaintiffs then "issued citations to discover [the Bauers'] assets" to fulfill the judgment. *Id.* Later on, the Bauers filed a federal suit, alleging various rights violations; all the alleged violations, however, related to the discovery of assets to fulfill the foreclosure judgment, not the merits of the foreclosure determination itself. *Id.* at 865–66. In other words, but for the state court's foreclosure judgment, none of the injuries about which the Bauers complained would have resulted. *Id.* at 866.

In *Swartz*, the plaintiffs complained that government officials unlawfully seized their goats and horses. 940 F.3d at 388. But that seizure was carried out pursuant to a court order. Indeed, *before* the seizure occurred, the officials went to state court; the state court entered an order finding probable cause for the seizure and ordering that the animals be seized. *Id.* at 389. This Court hence concluded that "the Swartzes' alleged injury was directly caused by the state court's orders." *Andrade*, 9 F.4th at 950 (quoting *Swartz*, 940 F.3d at 392).

Not unlike the plaintiffs in *Swartz*, Gilbank also alleges an unlawful seizure of her daughter, T.E.H. But Gilbank's causal chain is radically different from the Swartzes'. In *Swartz*, a court determined probable cause and ordered seizure *before*

---

[7] This Court expressly mentioned *Bauer* and *Swartz* in its recruitment order, and the district court invoked the former below.

the seizure occurred; here the seizure of T.E.H. "occurred *before* any judicial involvement." *Andrade*, 9 F.4th at 950 (emphasis added). So too for Gilbank's other pre-judicial-involvement claims: unlawful search, denial of attorney, *Monell. See supra* Argument II.D.1. Although other of Gilbank's injuries chronologically occurred after judicial involvement began—false information, lack of notice, *see id.*— none of them were caused by any of the state court's orders. They are either facially unrelated (unlawful search) or resulted from a causal chain that began with the indisputably pre-judicial-involvement unlawful seizure. And with others (false information, lack of notice), the causal chain is exactly reversed: the independently unlawful conduct caused the state-court judgment, not the other way around. *See Johnson v. Pushpin Holdings, LLC*, 748 F.3d 769, 773 (7th Cir. 2014) ("The [*Rooker-Feldman*] rule does not bar a federal suit that seeks damages for a fraud that resulted in a judgment adverse to the plaintiff. . . . Such a suit does not seek to disturb the judgment of the state court, but to obtain damages for the unlawful conduct that misled the court into issuing the judgment.").

*

In sum, for a federal claim to be "inextricably intertwined" with a state-court judgment, the judgment itself must have *caused* the injury complained of. If the causal chain runs the other way—unlawful conduct *caused* the state-court judgment—then the claim is not inextricably intertwined. So too if no causal relationship exists at all, such as where the injury-causing conduct occurred before any judicial involvement.

Here, some of Gilbank's claims are based on conduct (and corresponding injury) that occurred *before* any state-court proceedings began. Other of Gilbank's claims are based on conduct (and corresponding injury) that occurred *during* state-court proceedings. But, critically, *none* of Gilbank's claims is based on injury "*caused* by the *judgment itself*." *Behr*, 8 F.4th at 1212 (emphases added). With all of her claims, then, Gilbank complains she suffered injury caused by the conduct of defendants and "separate[ ] from [the] state court judgment." *Andrade*, 9 F.4th at 947 (cleaned up). Her claims are thus not "inextricably intertwined"—they are "independent," *Rooker-Feldman* does not apply, and this Court's analysis ends.

### E. Regardless, Gilbank lacked a reasonable opportunity to raise her claims in state court.

There is yet another basis for this Court to reject the district court's holding that *Rooker-Feldman* bars Gilbank's claims: Gilbank did not have a reasonable opportunity to raise these claims in the state-court proceedings. *See Andrade*, 9 F.4th at 950 ("Only if the plaintiff did have [a reasonable opportunity to raise the issue in state-court proceedings] does *Rooker-Feldman* strip federal courts of jurisdiction.").

As this Court explained in *Brokaw*, the issues raised by a federal plaintiff "cannot be inextricably intertwined with a state court judgment if the plaintiff did not have a reasonable opportunity to raise the issue in state court proceedings." 305 F.3d at 668 (quoting *Long*, 182 F.3d at 558). If the federal plaintiff lacked such an

opportunity, then "it is impossible to conclude that the issue was inextricably intertwined with the state court judgment." *Long*, 182 F.3d at 558.[8]

Typically, for a federal plaintiff to have been denied a reasonable opportunity to raise her claims in the state-court proceedings, there must have been "either some action taken by the state court or state court procedures in place" that formed a barrier that the plaintiff was "incapable of overcoming in order to present certain claims to the state court." *Id.* This Court has concluded, on multiple occasions, that a federal plaintiff was denied a reasonable opportunity to raise her claims in the state-court proceedings where controlling state-court procedures formed a barrier that the plaintiff was "incapable of overcoming in order to present certain claims to the state court." *Id.*; *Brokaw*, 305 F.3d at 668.

Take *Brokaw*—another child-custody case. Recall that in *Brokaw*, upon reaching the age of majority, the federal plaintiff brought claims against members of her family and various state actors and agencies who were involved in removing the plaintiff from her parents' custody when she was a minor child. 305 F.3d at 662. The federal plaintiff alleged that the defendants conspired to violate her constitutional rights through false accusations of child neglect against the plaintiff's parents. *Id.* This Court determined that *Rooker-Feldman* did not bar the federal plain-

---

[8] Other circuit courts of appeals adhere to a similar "reasonable opportunity" test. *See Wood v. Orange Cnty.*, 715 F.2d 1543, 1547 (11th Cir. 1983) ("[*Rooker-Feldman*] can apply only where the plaintiff had a reasonable opportunity to raise his federal claim in state proceedings."); *Ernst*, 108 F.3d at 492 (finding that the federal plaintiff lacked a realistic opportunity to litigate her constitutional claims in the state-court proceedings because "[a] dependency adjudication involves a determination that a child is without proper parental care or control, and subsequent decisions regarding custody and placement are made on the basis of the best interests of the child," and therefore, *Rooker-Feldman* did not preclude subject-matter jurisdiction) (internal citations omitted).

tiff's constitutional claims because, among other things, she lacked a reasonable opportunity to raise her claims in the prior juvenile court proceedings. *Id.* at 668.[9] In reaching this conclusion, this Court stressed that, in the child-neglect proceedings, the state court was permitted to "consider only the question whether the minor [wa]s abused, neglected . . . or dependent." *Id.* (quoting 705 ILCS 405/2-18). In other words, the controlling state-court procedures presented an insurmountable barrier to the federal plaintiff's ability to bring her constitutional claims. *Id.* Thus, the federal plaintiff lacked a reasonable opportunity to bring her constitutional claims in the state-court proceedings, and *Rooker-Feldman* did not bar her federal suit. *Id.*; *see also Ernst*, 108 F.3d at 492 (holding that the federal plaintiff lacked a realistic opportunity to litigate her constitutional claims in the state-court proceedings because "[a] dependency adjudication involves a determination that a child is without proper parental care or control, and subsequent decisions regarding custody and placement are made on the basis of the best interests of the child," and therefore, *Rooker-Feldman* did not preclude subject-matter jurisdiction) (internal citations omitted).

This Court reached the same conclusion in *Long*. In that case, the federal plaintiff sued her landlords and their attorneys, alleging that they fraudulently caused

---

[9] As discussed above, this Court also identified other grounds that the federal plaintiff in *Brokaw* presented an independent claim. *Brokaw*, 305 F.3d at 665 (concluding that the federal plaintiff's claim was independent because she was "not merely claiming that the decision of the state court was incorrect or that the decision violated her constitutional rights; rather, she [wa]s alleging that the people involved in the decision to forcibly remove her from her home and her parents and subject her to the custody of the [Illinois Department of Children and Family Services] violated her constitutional rights, independently of the state court decision").

her to be evicted from her home in violation of the Fair Debt Collection Practices Act (FDCPA) and her due process rights. *Long*, 182 F.3d at 551, 553. After readily concluding that the FDCPA claims were independent of the state court's eviction order and therefore not precluded by *Rooker-Feldman*, this Court turned to the more difficult question of whether the due-process claims were independent. *Id.* at 556. This Court began by observing that, because the federal plaintiff's alleged injuries would not have occurred absent the eviction order, the due-process claims resembled claims that the Court had previously held were barred by *Rooker-Feldman*. *Id.* at 556–57. And yet this Court then drew a "critical distinction" between the due process claims in *Long* and the claims in cases in which the Court had applied *Rooker-Feldman*. *Id.* at 557. Because the defendants' fraud in the state-court proceedings "effectively precluded [the federal plaintiff] from raising the claims she presented in" the federal suit, those claims were not "bound up with the eviction order," and therefore, *Rooker-Feldman* did not apply. *Id.* at 557.

Like the federal plaintiffs in *Brokaw* and *Long*, Gilbank lacked a reasonable opportunity to raise her claims in the prior state-court proceedings. The Wisconsin Supreme Court has long held that a juvenile court's jurisdiction is defined and limited by statute. *State ex rel. Koopman v. Cnty. Ct. Branch No. 1*, 38 Wis. 2d 492, 497, 157 N.W.2d 623, 626 (1968) ("It is well settled that the juvenile court is a creature of the statutes."). The Wisconsin Children's Code vests the juvenile court with "exclusive original jurisdiction over a child alleged to be in need of protection or services," Wis. Stat. § 48.13, and other matters relating to children, *id.* § 48.14. But the

Children's Code (Wis. Stat. ch. 48) does not contain any provision that allows the parent of a child subject to the juvenile court's jurisdiction (or the minor child, for that matter) to bring civil claims against third parties, as Gilbank and T.E.H. did in the federal district court here.

At a CHIPS plea hearing, for instance, the court is limited to determining whether any party wishes to contest the allegation that a child is in need of protection or services. *Id.* § 48.30(1). (Here, Gilbank lacked notice of the hearing as a matter of fact, as well. *See* App.21; R.41:5; App.7; R.131:6.) At a CHIPS fact-finding hearing, the court is limited to determining whether the allegations in the petition are proved by clear and convincing evidence. *Id.* And, at a CHIPS dispositional hearing, a party may only present evidence relevant to the issue of disposition, *id.* § 48.335(3), while the court is limited to entering one or more of the dispositions prescribed by statute, *id.* § 48.345 (enumerating available dispositions of child in need of protection or services). In short, the Wisconsin Children's Code did not provide any mechanism for Gilbank to bring—or for the juvenile court to consider—her claims. Thus, controlling state-court procedures presented a barrier to Gilbank bringing her claims, and *Rooker-Feldman* does not apply.

The statutes of limitations applicable to Gilbank's claims further highlight her inability to effectively raise those claims in the state-court proceedings. Under Wisconsin law, the limitations period for § 1983 and § 1985 claims is three years. *Id.* § 893.54(1m). By contrast, the strict, mandatory timeframes within which various stages of a CHIPS proceeding must take place would have precluded Gilbank from

effectively raising her claims, even if the juvenile court had subject-matter jurisdiction over those claims in the first instance (which it did not). *See id.* § 48.30(1) (hearing to determine whether any party wishes to contest an allegation that a child is in need of protection or services must take place within 30 days after the filing of a petition for a child who is not being held in secure custody); *id.* § 48.30(7) (in cases where CHIPS petition is contested, the court must hold a fact-finding hearing no more than 30 days after the plea hearing for a child who is not held in secure custody); *id.* § 48.31(7) (following the fact-finding hearing, the court must hold the dispositional hearing no more than 30 days after the fact-finding hearing for a child who is not held in secure custody).

These narrow timeframes reflect a delicate balance reached by the Legislature between protecting children and "provid[ing] judicial and other procedures through which children and all other interested parties are assured fair hearings and their constitutional and other legal rights are recognized and enforced." *Id.* § 48.01(1)(ad); *see also In re Termination of Parental Rts. to Daniel R.S.*, 2005 WI 160, ¶ 82, 286 Wis. 2d 278, 706 N.W.2d 269 ("[S]trict time limits between critical stages within the adjudication process are necessary to protect the due process rights of children and parents.") (quoting *In re Termination of Parental Rts. to Joshua S.*, 2005 WI 84, ¶ 17, 282 Wis. 2d 150, 698 N.W.2d 631). But these timeframes are inadequate (and were not intended to provide adequate time) for a party to investigate, pursue, and litigate claims like Gilbank's claims here. *See* Wis. Stat. § 893.54(1m) (providing three-year limitations period for § 1983 and § 1985 claims).

41

In sum, Gilbank did not have a reasonable opportunity to raise her claims in the prior state-court proceedings, so *Rooker-Feldman* does not apply, and the district court had subject-matter jurisdiction.

## III.   The Court should reverse and remand for consideration of all other issues.

Defendants on appeal may contend that even if *Rooker-Feldman* does not bar Gilbank's claims, this Court should affirm nonetheless. They may argue that Gilbank's claims fail on other threshold grounds, such as preclusion or qualified immunity—but because the district court did not weigh in on those grounds yet, this Court should refrain from doing so at this time. They may also argue, invoking the district court's apparent ruling to this end, that Gilbank's claims fail on the merits—but the district court issued this ruling while exercising impermissible hypothetical jurisdiction, thus rendering any of its remarks an unreviewable advisory opinion.

### A. The Court should remand for consideration of further threshold issues on which the district court has not yet ruled.

In its summary-judgment decision, the district court concluded it lacked subject-matter jurisdiction over Gilbank's claims. App.11–13; R.131:10–12. Although Defendants had offered other alternative threshold arguments for dismissal—including immunity and preclusion, among others—the district court neither adjudicated nor even mentioned those issues.

To that end, this Court should refrain from deciding any other threshold issues, as well. As "a court of review, not of first view," this Court should "remand the case to the district court to resolve [these issues] in the first instance." *VanderKodde*, 951

F.3d at 404 (quoting first *Cutter v. Wilkinson*, 544 U.S. 709, 718 n.7 (2005); then *Cavin v. Mich. Dep't of Corr.*, 927 F.3d 455, 459 (6th Cir. 2019)); *see Sharp*, 615 F.2d at 425 n.1 ("It is fundamental that this Court, in the exercise of its appellate jurisdiction, ordinarily will not consider a question which the district court, without objection by either party, failed to decide."); *State Wholesale Grocers v. Great Atl. & Pac. Tea Co.*, 258 F.2d 831, 839 (7th Cir. 1958) (similar).

Indeed, when reversing a district court's *Rooker-Feldman*-based dismissal, courts of appeals routinely decline to consider alternative grounds for affirmance, especially when the district court did not adjudicate them. *See, e.g.*, *Behr*, 8 F.4th at 1214 ("Because the district court dismissed the Behrs' complaint solely based on *Rooker-Feldman*, that is all we address here. . . . The Behrs' claims may indeed be subject to dismissal for those [other] reasons [raised by appellees], but we think it is better to leave these arguments to the district court to consider in the first instance."); *VanderKodde*, 951 F.3d at 404 (reversing *Rooker-Feldman*-based dismissal and remanding, while declining to address "alternate grounds on which to affirm" raised by appellees, because "the district court did not address any of them"); *Arnold*, 752 F.3d at 708 (vacating *Rooker-Feldman*-based dismissal and remanding for fulsome consideration of preclusion and abstention issues); *Brokaw*, 305 F.3d at 671 n.8 (reversing *Rooker-Feldman*-based dismissal and remanding, while declining to address "numerous alternative arguments for affirmance" raised by appellees where "none of those arguments concern subject matter jurisdiction"); *cf. Goodman ex rel. Goodman v. Sipos*, 259 F.3d 1327, 1331 (11th Cir. 2001), *rejected on other*

43

*grounds in Behr*, 8 F.4th at 1213–14 ("Although the defendants invite us to consider their qualified and/or absolute quasi-prosecutorial immunity claims in the event that we disagree that the *Rooker–Feldman* doctrine applies, we decline to exercise our discretion to do so."). Accordingly, if this Court agrees with Gilbank that the district court has subject-matter jurisdiction despite *Rooker-Feldman*, it should reverse and remand for consideration of all other threshold issues.

## B. The Court should disregard the district court's advisory opinion on the merits.

After concluding it lacked subject-matter jurisdiction to adjudicate Gilbank's claims, the district court nevertheless went on to opine on the merits of those very same claims. *Compare* App.11–13; R.131:10–12 *with* App.13–16; R.131:12–15. This was impermissible, and this Court should disregard what amounts to an advisory opinion. Just like with other threshold issues, if the Court agrees with Gilbank that the district court has subject-matter jurisdiction despite *Rooker-Feldman*, it should reverse and remand for consideration of the merits.

If a district court lacks subject-matter jurisdiction, it has no power to make any rulings beyond determining it lacks jurisdiction; any rulings it makes are null and void. *Mathis v. Metro. Life Ins. Co.*, 12 F.4th 658, 664 (7th Cir. 2021), *reh'g denied* (Sept. 24, 2021) ("If a court lacks subject-matter jurisdiction, a ruling it issues on the merits is void."). And, because "[w]ithout jurisdiction [a] court cannot proceed at all in any cause," it hence "may not assume jurisdiction for the purpose of deciding the merits of the case." *Sinochem*, 549 U.S. at 431 (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998)) (internal quotation marks omitted); *accord Stop*

44

*Reckless Econ. Instability Caused by Democrats v. Fed. Election Comm'n*, 814 F.3d 221, 228 (4th Cir. 2016) (similar); *Friends of the Everglades v. U.S. E.P.A.*, 699 F.3d 1280, 1288 (11th Cir. 2012) (similar); *Moore v. Maricopa Cnty. Sheriff's Office*, 657 F.3d 890, 895 (9th Cir. 2011) (similar). *See generally Resnick v. KrunchCash, LLC*, 34 F.4th 1028 (11th Cir. 2022); *id.* at 1040 (Newsom, J., concurring) (explaining doctrinal contours separating jurisdiction and merits); Wasserman, *supra*, at 701 (similar). Here, the district court violated that principle.

To begin, the district court *concluded* it lacked subject-matter jurisdiction under *Rooker-Feldman*. Specifically, the court stated that it "does not have jurisdiction over [Gilbank's] claims" alleging that the defendants (1) "us[ed] a warrantless urinalysis;" (2) "pressur[ed] her to talk about her drug use without an attorney;" and (3) "failed to follow state statutory requirements that would have given [her] greater notice and additional opportunities to present evidence." App.13; R.131:12.

Then, immediately after concluding it lacked subject-matter jurisdiction, the district court assumed subject-matter jurisdiction over those very same claims: "(1) the warrantless urinalysis; (2) the interrogation without an attorney at the police station; and (3) the denial of due process." App.13–14; R.131:12–13; *see id.* R.131:13 ("If these injuries *were actually* independent of the state court's decisions, Gilbank *might* be able to recover for those injuries in federal court." (emphases added)). Even if it hypothetically had jurisdiction, the court mused, it would still rule against Gilbank on the merits. App.13–16; R.131:12–15.

Yet, because it concluded it lacked subject-matter jurisdiction, the district court—operating per its own jurisdictional theory—had no authority to "proceed to decide the merits of the issues." *Stop Reckless*, 814 F.3d at 228; *see also Dillon v. Ind. Dep't of Child Servs.*, 841 F. App'x 1003, 1004 (7th Cir. 2021) ("Because *Rooker-Feldman* is a jurisdictional bar, it precludes consideration of the merits of [a] complaint.").[10] Such reasoning constituted an exercise of long-rejected "hypothetical jurisdiction"—a tactic capable of producing nothing but an advisory opinion, beyond both the district court's power to issue and this Court's power to review. *See Steel Co.*, 523 U.S. at 101–02 ("Hypothetical jurisdiction produces nothing more than a hypothetical judgment—which comes to the same thing as an advisory opinion, disapproved by this Court from the beginning.").

## CONCLUSION

The Court should reverse the judgment below and remand for further proceedings consistent with this Court's decision.

---

[10] To be sure, as explained above, the district court's *Rooker-Feldman* ruling was wrong: it had jurisdiction. But the point here is that the district court, operating per its own jurisdictional theory, had no basis to adjudicate the claims. Put differently, a district court must either conclude that it lacks subject-matter jurisdiction and stop, or it must conclude it has jurisdiction and proceed. It cannot do both.

Dated: October 17, 2022

/s/ Joseph S. Diedrich

JOSEPH S. DIEDRICH
   *Counsel of Record*
AJ FABIANCZYK
KIRSTEN A. ATANASOFF
ALYSSA M. LEROY*
HUSCH BLACKWELL LLP
33 E. Main St., Suite 300
Madison, WI 53703
(608) 255-4440
joseph.diedrich@huschblackwell.com
**Application for membership in Bar of*
*this Court forthcoming*

   *Counsel to Appellant*

**CERTIFICATE OF COMPLIANCE**

Under Federal Rule of Appellate Procedure 32(g), I certify the following:

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and Circuit Rule 32(c) because this brief contains 12,013 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and Circuit Rule 32(b), and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6), because this brief has been prepared in a proportionately spaced typeface using Microsoft Word in 12-point Century Schoolbook font.

Dated: October 17, 2022

/s/ Joseph S. Diedrich
JOSEPH S. DIEDRICH
*Counsel of Record*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 17, 2022, I filed the foregoing brief with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to all registered CM/ECF users.

Dated: October 17, 2022

/s/ Joseph S. Diedrich

JOSEPH S. DIEDRICH
*Counsel of Record*

**APPENDIX**

| Record Item | App. Pages |
|---|---|
| Judgment (Dec. 10, 2021), R.132 | App.1 |
| Summary Judgment Order (Dec. 10, 2021), R.131 | App.2–16 |
| Opinion and Order on Motion to Dismiss (Dec. 15, 2020), R.41 | App.17–28 |
| Amended Complaint (July 28, 2020), R.6 | App.29–51 |

**CIRCUIT RULE 30(d) STATEMENT**

I hereby certify that all of the materials required by Circuit Rule 30(a) and (b) are included in this Appendix.

Dated: October 17, 2022

/s/ Joseph S. Diedrich
JOSEPH S. DIEDRICH
   *Counsel of Record*

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

MICHELLE RENE' GILBANK,

     Plaintiff,

                                        Case No.  20-cv-601-jdp

  v.

WOOD COUNTY DHS, MARSHFIELD POLICE
DEPARTMENT, CHILDREN'S HOSPITAL
OF WISCONSIN, THERESA HEINZEN-JANZ,
DEREK IVERSON, MARY CHRISTENSEN,
ANNE LACHAPELLE, MARY SOLHEIM
GREGORY POTTER, and NICHOLAS BRAZEAU, JR.,

     Defendants.

JUDGMENT IN A CIVIL CASE

IT IS ORDERED AND ADJUDGED that judgment is entered in favor of defendants dismissing this case.

| /s/ | December 10, 2021 |
|-----|-------------------|
| Peter Oppeneer, Clerk of Court | Date |

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

MICHELLE R. GILBANK,

               Plaintiff,

    v.

MARSHFIELD POLICE DEPARTMENT,
THERESA HEINZEN-JANZ, DEREK IVERSON,
MARY CHRISTENSEN, ANNE LACHAPELLE,
and MARY SOLHEIM,

               Defendants.

OPINION and ORDER

20-cv-601-jdp

Pro se plaintiff Michelle R. Gilbank lost custody of her minor daughter for more than a year after she was arrested for possession of methamphetamine. Gilbank filed this lawsuit against the individuals involved in arresting her and placing her daughter in protective custody. Gilbank contends that defendants violated her constitutional rights by falsifying evidence, removing her daughter without probable cause to believe that she was in danger, and denying Gilbank the opportunity to challenge the removal.

All parties have filed motions for summary judgment that are ready for decision. Dkt. 58 (Gilbank's motion); Dkt. 75 (Wood County defendants' motion): Dkt. 66 (Marshfield defendants' motion). Gilbank argues in her numerous briefs that defendants violated her rights under the United States Constitution and Wisconsin law by taking various actions that resulted in her losing custody of her daughter.

I understand Gilbank's frustration with aspects of the state proceedings. But Gilbank's primary injury—loss of custody of her daughter—was the result of the state juvenile court decision. For reasons explained in this opinion, this court does not have authority to review state court decisions. Gilbank's recourse is to appeal those decisions through the state court

system, and from there to the United States Supreme Court. The other injuries about which Gilbank complains—the warrantless urine test, denial of counsel, and denial of due process—were either already addressed by the state juvenile court or are not constitutional violations. Accordingly, I must deny Gilbank's motion for summary judgment and grant defendants' motions.

## UNDISPUTED FACTS

I find the following facts to be undisputed unless otherwise noted.

### A. The parties

Michelle Gilbank is the mother of a minor daughter, T.E.H., who was born in 2014. Plaintiff had sole custody and placement of T.E.H. until November 2017, when Ian Hoyle, T.E.H.'s father, was granted supervised visitation rights. (Hoyle's visits were supervised because he has a prior conviction for first-degree sexual assault of a child.) Gilbank has a history of mental illness, including post-traumatic stress disorder, and methamphetamine use.

During the relevant time, defendant Derek Iverson was a detective with Marshfield Police Department in Marshfield, Wisconsin. The other defendants worked for Wood County Human Services Department: Theresa Heinzen-Janz was an initial assessment social worker; Anne LaChapelle was an initial response social worker supervisor; and Mary Solheim was the deputy director of the Human Services.

### B. Gilbank's contact with Heinzen-Janz and Iverson

In February or March 2018, Gilbank and T.E.H. were living at a friend's house. When the house went into foreclosure, Gilbank and T.E.H. moved into Ian Hoyle's apartment. T.E.H. had her own room in Hoyle's apartment, and Gilbank slept either in the apartment or the

App.03

garage. Gilbank and Hoyle's relationship was tense. Hoyle did not like Gilbank living at the apartment, and Gilbank accused Hoyle of being an alcoholic with anger management problems.

Gilbank and T.E.H. were still living with Hoyle in June 2018, during a time of extremely hot weather. On June 29, 2018, an anonymous caller contacted Wood County Human Services and reported that she was worried about a woman and her child who appeared to be living in Hoyle's garage, which lacked air conditioning. Defendants Heinzen-Janz and Detective Iverson went to Hoyle's apartment and talked to Gilbank and T.E.H. Defendants noted that T.E.H. had her own room in the apartment and that she appeared to be well-cared for and in good health. But Gilbank told Heinzen-Janz that the apartment was not a good environment for T.E.H., and that she needed help finding better housing, access to prescription medications, and mental health care for herself. Heinzen-Janz told Gilbank that she would assist her, and they scheduled a meeting for the following week.

In preparation for the follow-up meeting, Heinzen-Janz reviewed Gilbank's history with Wood County Human Services. Heinzen-Janz learned that Gilbank had had contact with Human Services in the past. She also learned that Gilbank had a history of drug use, and that she had a pending charge for methamphetamine possession from August 2017. Heinzen-Janz and Detective Iverson also talked to Hoyle about Gilbank. Hoyle told them that he was concerned about Gilbank's drug use and that he wanted her to move out of his apartment.

Heinzen-Janz and Iverson met with Gilbank on July 3, 2018. Gilbank thought that Heinzen-Janz had come to talk to her about housing options, and she was upset that Iverson was present. Heinzen-Janz and Iverson asked Gilbank about her drug use. Gilbank admitted that she had used methamphetamine in the past, but she stated that she had not used it in approximately three weeks. Gilbank agreed to provide a urine sample.

3

Gilbank's urine sample was positive for amphetamines and methamphetamines. When Heinzen-Janz and Iverson shared the urinalysis results with Gilbank, Gilbank denied using drugs and insisted that the results were wrong. She told Heinzen-Janz and Iverson that she had recently used Hoyle's sinus inhaler, which might have caused a false positive. (Gilbank continues to insist that the results were wrong, but her dispute is immaterial to the summary judgment motions. In any case, Gilbank now admits that she smoked methamphetamine "residue" on July 1, 2018, two days before providing the urine sample.) Despite Gilbank's positive urinalysis, neither Heinzen-Janz nor Iverson threatened or attempted to arrest Gilbank or remove T.E.H. from Gilbank's custody.

## C. Gilbank's arrest and loss of custody

Between July and August 2018, Gilbank contacted a health clinic for mental health assistance, had found a lead on an apartment, and had obtained money for a security deposit from a community organization. But on August 21, 2018, Gilbank was pulled over for driving with a suspended license. The officer requested the assistance of K9 unit, which arrived and alerted to the presence of a controlled substance. T.E.H. was in the vehicle with Gilbank at the time, so Gilbank called Hoyle, who came with his mother and left with T.E.H. Officers searched Gilbank's vehicle and found 0.7 grams of methamphetamine, a glass pipe with white crystal-like residue, and three clear plastic bags containing a white crystal-like residue. Gilbank was then arrested for possession of methamphetamine and drug paraphernalia.

Gilbank was taken to the police department, where she was interviewed by Heinzen-Janz and Detective Iverson. (The parties submitted an audio and video recording of the interview with the court.) Iverson read Gilbank her *Miranda* rights, and Gilbank told Iverson that she did not want to answer questions without a lawyer present. Iverson responded that he

would not talk to her about the items that had been found in her vehicle, but that he needed to talk to her about her drug use as it related to T.E.H. Iverson stated that he thought that Gilbank was still using methamphetamine because she was associating with known drug dealers and users. Heinzen-Janz told Gilbank that she wanted to create a safety plan under which T.E.H. could stay with Gilbank, but that Gilbank needed to cooperate. Gilbank responded that she had never used methamphetamine around T.E.H., and she denied having a methamphetamine problem. She stated that she was trying to be a better person, had made some progress toward finding housing and health care, and that she needed help. Iverson questioned Gilbank's truthfulness, stating that drugs were found in the vehicle where T.E.H. had been a passenger, that Gilbank had admitted to medicating with methamphetamine, and that she had had a positive urine test for methamphetamine the previous month. Gilbank eventually refused to talk any further. Heinzen-Janz told her that the county would be taking temporary physical custody of T.E.H. and placing her with Hoyle, that a hearing would be held in a day or two, and that Heinzen-Janz would call Gilbank to tell her the time and date of the hearing. Gilbank was taken to the county jail.

Heinzen-Janz filed a request for temporary physical custody in Wood County Juvenile Court the following day. The request stated that Gilbank had been arrested and taken into custody for drug possession, that Gilbank had refused to cooperate with safety planning, and that T.E.H. would be subjected to neglect due to Gilbank's drug use. Heinzen-Janz also submitted a petition for a child in need of protective services under Wis. Stat. § 48.13(10), commonly referred to as a "CHIPS petition." The CHIPS petition stated that Gilbank could not care for T.E.H. because she continued to deny her drug use, had refused to cooperate with Human Services, and was consistently intoxicated or under the influence of drugs. The CHIPS

5

petition also stated that Gilbank had allowed individuals involved in selling and using drugs to interact regularly with her children, and that she refused to acknowledge the risks to T.E.H.'s safety. (Gilbank disputes the accuracy of Heinzen-Janz's statements in the CHIPS petition, noting that, among other things, she was not consistently under the influence, that she had not been offered any help or a plan from Heinzen-Janz or the county, and that she did not permit drug users or dealers to be around T.E.H.)

## D. Court proceedings

### 1. Temporary physical custody hearing

A temporary physical custody hearing was scheduled for August 23, 2018. Heinzen-Janz called the Wood County jail, and jail staff told her that they would notify Gilbank about the hearing. But Gilbank had been released, so she did not receive notice of the hearing.

The hearing was held in juvenile court without Gilbank. A guardian ad litem that had been appointed for T.E.H. was present, as was an assistant district attorney, Heinzen-Janz, and Ian Hoyle. The guardian ad litem had not yet met or spoken to Gilbank or T.E.H., but he gave the opinion that it was in the best interest of T.E.H. to be placed with Hoyle. The court concluded that the information in the temporary custody request provided by Heinzen-Janz established probable cause to find that Gilbank was neglecting T.E.H., or was unable to provide adequate supervision and care of T.E.H. The court ordered that T.E.H. should be placed with Hoyle until the next hearing. Heinzen-Janz and Iverson instructed Hoyle that if Gilbank came to his house to see T.E.H., he should tell her that visits had to be arranged and supervised by Human Services. They also told Hoyle to call the police if Gilbank refused to leave.

On August 24, 2018, Gilbank filed a motion to dismiss the temporary custody order. She argued that the order was not necessary because she had already placed T.E.H. in the

temporary custody of her father, Hoyle. She also argued that there was insufficient evidence to support taking her child, and that various government actors had violated her constitutional rights. She requested that the probable cause hearing be reopened because she had not received notice of it. The court denied Gilbank's motion.

## 2. CHIPS petition evidentiary hearings

An evidentiary hearing on the CHIPS petition was held on September 25, 2018. Heinzen-Janz filed a report with the court that described, among other things, T.E.H.'s current situation, Gilbank's history, and Human Service's recommendations regarding placement and visitation. Heinzen-Janz recommended that T.E.H. remain in the care of her father, Hoyle, based on Gilbank's continued denial of her drug use and her lack of cooperation with the Human Services.

Gilbank appeared at the hearing with an attorney. An assistant district attorney presented evidence from Hoyle, Iverson, Heinzen-Janz, and the police officer who had arrested Gilbank for possession of methamphetamine the previous month. Hoyle testified that the last time he saw Gilbank use drugs was in January 2017, and that he and Gilbank had used drugs together on that occasion, but that he suspected she might still use drugs. Hoyle also testified that Gilbank was meeting all of T.E.H.'s needs, and that he did not have concerns about T.E.H. being fed, clothed, housed, or well-nourished. Iverson testified that T.E.H. appeared to be clean, well-fed, and well-cared for in his interactions with her. But Heinzen-Janz gave the opinion that even though T.E.H. had been well-cared for, and that Gilbank had taken steps to secure housing and mental health treatment, Gilbank's ongoing methamphetamine use presented an unsafe situation for T.E.H. Heinzen-Janz also stated that Gilbank had refused to cooperate since her arrest, though she admitted that Gilbank had contacted Human Services

immediately after her release to find out what she needed to do to obtain visitation with T.E.H. Heinzen-Janz also conceded that Gilbank might have been reluctant to discuss drug use after being arrested because law enforcement was present, she had been read her *Miranda* rights, and she did not want to incriminate herself.

Gilbank's attorney cross-examined the state's witnesses, but she did not present any evidence or call witnesses on Gilbank's behalf. Her attorney argued that the state had failed to meet its burden to show that T.E.H. was in danger or that Gilbank had neglected T.E.H. The guardian ad litem gave the opinion that T.E.H. needed protective services, and that he did not object to her placement with Hoyle. The court found that T.E.H. needed to be protected from Gilbank's drug use, and it ordered supervision of T.E.H. for a period not exceeding one year. Another hearing on placement was set for October 29, 2018.

At the October 29 hearing, Gilbank's attorney argued that T.E.H. should be placed with Gilbank, and that Gilbank could comply with all of the court's and Human Service's recommendations while retaining custody of T.E.H. Gilbank testified on her own behalf, stating that she had not used methamphetamine since before August 2018, and that she provided a more nurturing and attentive environment for T.E.H. than Hoyle did. A friend of Gilbank's testified that Gilbank had been living with her, in a house, for approximately three weeks, that T.E.H. could live there and have her own room, that she had no concerns about unannounced visits from Human Services, and that she had never used methamphetamines. Gilbank also presented letters written by Hoyle, Scott Gilbank (her husband, from whom she was separated), and her daughter, all of whom described Gilbank's positive parenting.

Heinzen-Janz testified that T.E.H. should remain with Hoyle because Gilbank's drug use and lack of cooperation made reunification impossible. The court agreed with Heinzen-

App.09

Janz, and it concluded that T.E.H. needed protection from Gilbank due to Gilbank's methamphetamine addiction. The court ordered that T.E.H. should remain with Hoyle for at least a year. Gilbank later filed a pro se motion to dismiss the CHIPS petition, arguing that the state had failed present evidence that T.E.H. had been neglected, that the court had refused to permit Gilbank to present evidence, and that T.E.H. should be placed with Gilbank. The court denied the motion.

### 3.  CHIPS closure hearing and Gilbank's appeal

On September 9, 2019, the Wood County Juvenile Court held a closure hearing on the CHIPS petition. All of the involved parties, including Gilbank and Hoyle, agreed that the CHIPS case should be closed because there was a separate case in family court addressing custody and physical placement of T.E.H. The court agreed, and it entered an order closing the CHIPS case.

On November 1, 2019, Gilbank filed a pro se appeal of the closure order. The Wisconsin Court of Appeals dismissed Gilbank's appeal in January 2020, noting that Gilbank had no standing to appeal because she had approved of the closure order in the circuit court. In addition, the CHIPS case no longer governed the custody and placement of T.E.H.

In March 2020, Gilbank regained sole custody of T.E.H.

### E.  Federal lawsuit

Gilbank filed this lawsuit in June 2020. In her complaint, Gilbank sued nearly everyone involved in the investigation and legal proceedings regarding the removal of T.E.H. from Gilbank's custody, including police officers, social workers, and the presiding judges in juvenile court. She raised numerous claims under the constitution and various statutory provisions. I dismissed several of her claims in a previous order, Dkt. 41, including her claims against the

App.10

state court judges, Children's Hospital of Wisconsin, and Wood County Department of Human Services. I also dismissed T.E.H. as a plaintiff.

During discovery and the briefing of the summary judgment motions, Gilbank withdrew a number of claims, including her claims under HIPPA and the First Amendment, Sixth Amendment, Seventh Amendment, and Eighth Amendment. Dkt. 115, ¶ 83 and Dkt. 118, at 2–3. Because Gilbank has withdrawn these claims, I need not discuss them further.

The remaining defendants are four Wood County social workers (Theresa Heinzen-Janz, Mary Christensen, Ann LaChappelle, and Mary Solheim), the Marshfield Police Department, and Marshfield police detective Derek Iverson. Gilbank's claims against Christensen, LaChappelle, and Soheim are largely based on their supervising and approving Heinzen-Janz's actions.

OPINION

Gilbank contends that the remaining defendants violated her constitutional rights by: (1) taking a urine sample without a warrant; (2) failing to provide a lawyer to her during her post-arrest interrogation; (3) temporarily placing T.E.H. with Hoyle without probable cause to believe that T.E.H. was in danger; (4) pursuing the CHIPS petition based on false and incomplete information about Gilbank and Hoyle; (5) failing to give Gilbank adequate notice and an opportunity to be heard regarding T.E.H.'s placement; (6) evicting Gilbank from her home at Hoyle's house and rendering her homeless; (7) restricting the visitation that Gilbank had with T.E.H.; and (8) violating numerous state statutes that govern protective custody.

I am sympathetic to Gilbank's arguments. By all accounts, Gilbank and T.E.H. had a strong bond, and T.E.H. was a happy and healthy child despite Gilbank's ongoing struggle with

methamphetamine. Gilbank was understandably devastated and angry when she lost custody of her daughter. She had only recently reached out to defendants for help with housing and mental health care, and she felt betrayed by the results of her efforts. To make matters worse, the juvenile court's order on the CHIPS petition essentially left Gilbank homeless, as it prohibited her from living with T.E.H. at Hoyle's apartment, where Gilbank had been staying prior to her arrest.

But most of the injuries about which Gilbank now complains were the result of the Wood County Juvenile Court's orders in the CHIPS case. Over the course of multiple hearings, the juvenile court considered Gilbank's claims that T.E.H. was seized without probable cause and was not in need of protection. The state court heard the arguments, weighed the evidence, determined credibility, and found probable cause that T.E.H. was in need of protection. The court considered and approved the requirements of the CHIPS petition regarding T.E.H.'s placement and Gilbank's visitation rights. The *Rooker-Feldman* doctrine prohibits this court from reviewing those orders or to issue a decision that would undermine the validity of those orders.

Under the *Rooker-Feldman* doctrine, lower federal courts lack jurisdiction over cases brought by "state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005). *See also Rooker v. Fid. Tr. Co.*, 263 U.S. 413, 415–16, (1923); *District of Columbia Ct. of App. v. Feldman*, 460 U.S. 462, 486 (1983); *Golden v. Helen Sigman & Assoc.*, 611 F.3d 356, 361–62 (7th Cir. 2010). The *Rooker-Feldman* doctrine also prohibits lower federal courts from deciding matters "inextricably related to state court decisions." *EOR Energy LLC v. Illinois Envtl. Prot. Agency*, 913 F.3d 660, 664 (7th Cir. 2019).

Gilbank argues that the juvenile court's decisions were the result of fraud and constitutional violations. She argues that defendants presented false evidence about her drug use and alleged neglect of T.E.H. She accuses defendants of meeting secretly with Hoyle, of using a warrantless urinalysis, and of pressuring her to talk about her drug use without an attorney, all in an effort to remove T.E.H. from her custody. She also complains that defendants and the juvenile court failed to follow state statutory requirements that would have given Gilbank greater notice and additional opportunities to present evidence during the CHIPS proceedings.

But Gilbank presents all of these arguments as a way to attack the juvenile court's decision to provide T.E.H. with protective services and place her with Hoyle. Because a finding in Gilbank's favor would contradict the state court's orders, this court does not have jurisdiction over her claims. *See Bauer v. Koester*, 951 F.3d 863, 866 (7th Cir. 2020) (lawsuit is barred by *Rooker-Feldman* doctrine if "any finding in favor of the [plaintiff] would require [the federal court] to contradict the state court's orders"); *Golden*, 611 F.3d at 362 (federal court lacked jurisdiction to hear claim based on injuries caused by state-court custody orders unfavorable to plaintiff); *Dillon v. Indiana Dep't of Child Servs.*, 841 F. App'x 1003, 1004 (7th Cir. 2021) (*Rooker-Feldman* barred claim "that serious constitutional violations produced the state court's adverse judgments"). Arguments like Gilbank's must be pursued on appeal through the state courts. Gilbank's only federal remedy would be to seek review of the state-court decisions in the United States Supreme Court.

Gilbank contends that some of her injuries occurred prior to, and exist independently of, the state court's custody decision. Specifically, she argues that, regardless of the state court's protection and custody decisions, she was injured by the following: (1) the warrantless

12

urinalysis; (2) the interrogation without an attorney at the police station; and (3) the denial of due process. If these injuries were actually independent of the state court's decisions, Gilbank might be able to recover for those injuries in federal court. *See Iqbal v. Patel*, 780 F.3d 728, 730 (7th Cir. 2015) ("[I]f a plaintiff contends that out-of-court events have caused injury that the state judiciary failed to detect and repair, then a district court has jurisdiction—but only to the extent of dealing with that injury."). But even if I assumed that Gilbank suffered injuries that were not caused by, or inextricably related to, the state court's decisions, Gilbank has not presented evidence to support any constitutional violations based on the above incidents.

First, Gilbank consented to the urinalysis. Although she says she felt pressured to consent, she does not say that defendants threatened her, bribed her, or otherwise suggested that she had no choice but to consent. Because she consented to the urinalysis, she cannot sustain a constitutional claim against defendants based on an unlawful search or seizure. *See United States v. White*, 781 F.3d 858, 860–61 (7th Cir. 2015) (Fourth Amendment protections do not apply when person consents to the search).

Second, defendants' questioning of Gilbank without an attorney did not violate her Fifth Amendment right against self-incrimination. The Fifth Amendment guarantees that no person "shall be compelled in any *criminal case* to be a witness against himself." U.S. Const. Amend. V (emphasis added). The Fifth Amendment does not apply to state child protection proceedings. *See Chavez v. Martinez*, 538 U.S. 760, 769 (2003) (to assert viable § 1983 claim based on violation of the right against self-incrimination, the incriminating statement at issue must be used in a criminal case). Because Gilbank has not alleged that any statements that she made during the interview with Heinzen-Janz and Iverson after her arrest were used against her in a criminal proceeding, she has not stated a Fifth Amendment claim.

13

App.14

Third, Gilbank's due process arguments were either addressed and rejected by the state court already, they lack merit, or they are based solely on state statutes that do not support a federal constitutional claim. Gilbank argued in state juvenile court that she was denied improper notice and that the probable cause hearing should be reopened. The state court rejected her arguments. So Gilbank's due process claims based on improper notice and procedural flaws at the probable cause hearing are barred by the doctrine of issue preclusion, which bars relitigation of issues that have been litigated and decided in a previous action. *See Aldrich v. Labor & Industry Review Commission*, 2012 WI 53, ¶ 88, 341 Wis. 2d 36, 68, 814 N.W.2d 433, 449; *Jensen v. Foley*, 295 F.3d 745, 747 (7th Cir. 2002) (state court probable cause finding in child endangerment proceedings precluded relitigation of the issue).

In addition, Gilbank's due process arguments are not supported by evidence. The undisputed facts show that Gilbank, with the assistance of counsel, was given multiple opportunities to challenge the removal of T.E.H. from her custody. She was permitted to present witnesses and other evidence, testify on her own behalf, and cross-examine the state's witnesses. Although Gilbank was unsatisfied with the results of the state court hearings, she was provided process sufficient to satisfy federal constitutional standards.

Finally, Gilbank's arguments that defendants and the state court failed to adhere strictly to state statutory requirements for child protection hearings are not sufficient to state a federal due process violation. *See Wallace v. Tilley*, 41 F.3d 296, 301 (7th Cir. 1994) ("The denial of state procedures in and of itself does not create inadequate process under the federal constitution."); *Osteen v. Henley*, 13 F.3d 221, 225 (7th Cir. 1993) ("[A] violation of state law . . . is not a denial of due process, even if the state law confers a procedural right.").

In sum, most of Gilbank's claims are based on injuries that were either caused by the state juvenile court's decision or were considered and rejected already by a state court. This court cannot provide Gilbank relief on those claims. Gilbank's other claims lack any evidentiary basis. Defendants are entitled to summary judgment.

ORDER

IT IS ORDERED that:

1. Plaintiff Michelle Gilbank's motion for summary judgment, Dkt. 58, is DENIED.

2. The motion for summary judgment filed by defendants Derek Iverson and Marshfield Police Department, Dkt. 66, is GRANTED.

3. The motion for summary judgment filed by defendants Mary Christensen, Theresa Heinzen-Janz, Anne La Chapelle, and Mary Solheim, Dkt. 75, is GRANTED.

4. The clerk of court is directed to enter judgment for defendants and close this case.

Entered December 10, 2021.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge

App.16

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

MICHELLE R. GILBANK and
T.E.H., a minor, by next friend and mother,
Michelle R. Gilbank,

                    Plaintiffs,

        v.

WOOD COUNTY DEPARTMENT OF HUMAN                      OPINION and ORDER
SERVICES, MARSHFIELD POLICE DEPARTMENT,
CHILDREN'S HOSPITAL OF WISCONSIN,                         20-cv-601-jdp
THERESA HEINZEN-JANZ, DEREK IVERSON,
MARY CHRISTENSEN, ANNE LACHAPELLE,
MARY SOLHEIM, GREGORY POTTER, NICHOLAS
BRAZEAU, JR., and DOES 1-10,

                    Defendants.

---

Pro se plaintiff Michelle R. Gilbank filed this lawsuit against two government agencies, a hospital, four social workers, a police detective, and two judges, contending that defendants violated her and her minor daughter's constitutional rights when T.E.H. was removed from her custody for more than a year. Several motions are pending before the court.

First, the defendant judges (Gregory Potter and Nicolas Brazeau, Jr.) have filed motions to dismiss on several grounds. Dkt. 4 and Dkt. 7. I will grant those motions because plaintiffs' claims against the judges are barred by the Eleventh Amendment and the doctrine of judicial immunity.

Second, the Wood County defendants (Wood County Department of Human Services and social workers Theresa Heinzen-Janz, Mary Christensen, Anne La Chappelle, and Mary Solheim) have filed a motion to dismiss some of plaintiffs' claims. Dkt. 17. The Department argues that it cannot be sued, and the individual defendants argue that plaintiffs' conspiracy

App.17

claims under 42 U.S.C. § 1986 should be dismissed. Defendants' arguments are persuasive, so I will grant the motion.

Third, defendant Children's Hospital of Wisconsin filed a motion to dismiss plaintiffs' claims against it, arguing that plaintiffs' allegations do not state any claim for relief against it. Dkt. 19. I agree and will grant that motion as well.

Fourth, the Wood County defendants filed a motion to dismiss T.E.H.'s claims on the ground that she is not represented by counsel or a guardian ad litem. Dkt. 31. Plaintiffs responded to the motion by requesting that the court assist them in recruiting counsel or a guardian ad litem to represent T.E.H. Dkt. 37. Gilbank also filed motion to be exempted from paying PACER fees. Dkt. 16. For the reasons below, I will grant the county defendants' motion to dismiss T.E.H.'s claims without prejudice, and I will deny Gilbank's motions without prejudice.

ALLEGATIONS OF FACT

Gilbank alleged the following facts in her amended complaint, which I accept as true for purposes of evaluating defendants' motions to dismiss.

In June 2018, plaintiff Michelle Gilbank and her minor child, T.E.H., who was four years old at the time, were living temporarily with T.E.H.'s father, Ian Hoyle. Hoyle had been convicted of first-degree sexual assault of a six-year-old girl, and he was permitted to have only supervised visits with T.E.H. Hoyle drank alcohol and used drugs on a regular basis, and sometimes his behavior became inappropriate or dangerous, causing Gilbank and T.E.H. to leave the residence frequently.

On June 29, 2018, one of Hoyle's neighbors reported to the police that Hoyle had been yelling at Gilbank and T.E.H. and had locked them out. Defendant Theresa Heinzen-Janz, a social worker from Wood County Human Services, and two officers from the Marshfield Police Department came to Hoyle's residence to perform a welfare check. Gilbank told Heinzen-Janz and the officers that she and T.E.H. were safe at the moment because Hoyle was at work, but that Gilbank needed help finding housing and accessing mental health care. Heinzen-Janz said that she would return to see Gilbank on July 3. Before July 3, Heinzen-Janz and defendant Derek Iverson, a detective from Marshfield Police Department, spoke with Hoyle about Gilbank. Hoyle apparently reported that Gilbank had drug problems.

On July 3, Heinzen-Janz and Iverson went to see Gilbank at Hoyle's residence. Iverson asked Gilbank about her drug use. Gilbank stated that she had used street drugs in the past to alleviate her PTSD symptoms. She also said that living with Hoyle made it hard to maintain sobriety because he was always high or drunk. Iverson made Gilbank take a drug test, and Heinzen-Janz forged Gilbank's signature on a paper stating that the test was voluntary. Heinzen-Janz and Iverson left, but they surveilled Gilbank over the next couple of weeks.

On July 26, Hoyle punched holes in the walls of his residence and ripped his phone in half while yelling at Gilbank. Hoyle then called the police and asked them to remove Gilbank from his residence. Defendant Iverson and defendant Doe 1, a social worker with Wood County Department of Human Services, arrived at Hoyle's residence. Hoyle left to go drink at a bar. Iverson told Gilbank and T.E.H. to sleep in the garage that night to be safe. Gilbank found out later that Iverson did not file a report of the incident.

A few weeks later, Gilbank woke up during the middle of the night because Hoyle was attempting to remove her clothes. She fought him off and he left the room. The next morning,

3

Gilbank found Hoyle in the living room, where he was unclothed and masturbating while watching pornography on the television. T.E.H. was sitting next to him. Gilbank took T.E.H. and left.

Three days later, on August 21, 2018, Gilbank told Hoyle that she and T.E.H. were moving out and that she had an appointment for housing assistance that morning. Unbeknownst to Gilbank, Hoyle then contacted defendants Heinzen-Janz, Iverson, and Anne La Chappelle, another social worker with Wood County Department of Human Services, about removing T.E.H. from Gilbank's custody. Heinzen-Janz, Iverson, La Chappelle, and others from Marshfield Police Department and Human Services planned to seize T.E.H. from Gilbank. They did not obtain a warrant or talk to a judge about their plan.

After Gilbank and T.E.H. finished their housing appointment, a Marshfield police officer stopped Gilbank in her car. The officer told Gilbank that her license had been suspended for failure to pay a previous ticket. A K9 unit arrived, and Gilbank and T.E.H. were ordered to leave the vehicle. Gilbank called Hoyle, Hoyle's mother, and a friend, and asked them to pick up T.E.H. at the traffic stop.

After receiving Gilbank's call, Hoyle immediately went to his lawyer's office and directed his lawyer to file a motion for sole custody of T.E.H. and termination of his child support obligations. The motion stated that Gilbank had been arrested for possession of methamphetamine. The motion was filed before the search of Gilbank's car was complete and before she was arrested or charged.

Drugs and paraphernalia were found in Gilbank's car. (Gilbank says that the items belonged to Hoyle.) Gilbank was arrested and taken to Marshfield Police Department for questioning by defendants Iverson and Heinzen-Janz. Gilbank stated that she did not know

about any drugs in the vehicle and she asked for an attorney. Iverson declined to call an attorney for Gilbank and continued to question her, stating that if she did not admit guilt and cooperate, he would report that she was not cooperating with the "safety plan" and that she was a danger to her child. Iverson also stated that he would recommend placement of T.E.H. with Hoyle if she did not cooperate. Gilbank was not aware that there was a safety plan in place. Later that day, she was notified that T.E.H. had been placed with Hoyle. She was also told that she could not to contact T.E.H., that she could not return home, and that there would be a hearing regarding custody within 48 hours.

Gilbank posted bail on August 22, and she returned to the courthouse on August 23 to ask about the custody hearing. She was told that the hearing had taken place already, before defendant Judge Gregory Potter. Heinzen-Janz and Iverson gave false testimony at the hearing to justify the removal of T.E.H. without a warrant. Gilbank wrote to Judge Potter that she contested T.E.H.'s placement with Hoyle. Potter then recused himself from the case, and the case was transferred to defendant Judge Nicolas Brazeau, Jr. Gilbank filed motions requesting that the hearing be reopened, but Judge Brazeau denied her motions.

On September 6, 2018, Gilbank was interviewed at Children's Hospital of Wisconsin. Gilbank was given a release form to sign, which stated that information about her visits with T.E.H. would be released to Hoyle. Gilbank stated that she did not feel comfortable with Hoyle having information about her because he had abused her. Hospital staff told Gilbank that if she did not sign the release, she would not be able to see T.E.H.

On September 25, 2018, the court held an evidentiary hearing at which several witnesses testified that Gilbank was a good mother to T.E.H. and that T.E.H. was healthy and well cared for. Defendant Heinzen-Janz testified that because Gilbank had testified positive for

drugs on July 3, 2018, Gilbank obviously had an addiction problem that was out of control. Brazeau concluded that Gilbank was lying about her drug use, and he ordered that T.E.H. remain with Hoyle, even though Hoyle admitted at the hearing that he had used drugs.

Gilbank was upset about T.E.H. being taken from her and told Human Services about Hoyle's drug and alcohol use and addictions, but defendant Mary Christensen, another social worker with Wood County, told her that if she continued to complain that she would never get T.E.H. back. Whenever Gilbank complained about what had happened, Christensen would increase restrictions on Gilbank's visits with T.E.H. Christensen, Heinzen-Janz, and Iverson later shared Gilbank's urine test results and mental health prescriptions with Hoyle.

In February 2020, Gilbank regained full custody of T.E.H. after Hoyle admitted that he had been placing his fingers on T.E.H.'s vagina daily. T.E.H. received a sexual assault examination, and both Gilbank and T.E.H. have experienced ongoing trauma as a result of the incidents of the past two years.


OPINION

Gilbank has sued Wood County Department of Human Services, Marshfield Police Department, Children's Hospital of Wisconsin, Detective Derek Iverson, Judges Gregory Potter and Nicholas Brazeau, Jr., and four social workers: Teresa Heinzen-Janz, Mary Christensen, Anne La Chapelle, and Mary Solheim. She discusses several legal theories in her complaint, including:  interference with her and T.E.H.'s right to familial association; unlawful seizure of T.E.H.; violation of Gilbank's right to counsel and against self-incrimination; and violation of Gilbank's and T.E.H.'s due process rights.

## A.  T.E.H.'s claims and Gilbank's motion requesting assistance in recruiting counsel

T.E.H. is a minor, and minors can bring suit in federal court only through an appointed representative, a guardian ad litem, or a next friend. Fed. R. Civ. P. 17(c). Gilbank has identified herself as T.E.H.'s next friend, but a parent cannot sue as a next friend on behalf of a minor child unless the parent is represented by counsel. *See Elustra v. Mineo*, 595 F.3d 699, 705 (7th Cir. 2010) ("[A] non-attorney parent must be represented by counsel in bringing an action on behalf of his or her child.") (citation omitted). Acknowledging this rule, Gilbank has filed a motion requesting that the court recruit counsel to represent her or appoint a guardian ad litem to represent T.E.H. I will deny Gilbank's motion.

A pro se litigant does not have a right to counsel in a civil case, *Olson v. Morgan*, 750 F.3d 708, 711 (7th Cir. 2014), but a district court has discretion to assist pro se litigants in finding a lawyer to represent them. *Pruitt v. Mote*, 503 F.3d 647, 649 (7th Cir. 2007). A party who wants assistance from the court in recruiting counsel must meet certain requirements. *Santiago v. Walls*, 599 F.3d 749, 760–61 (7th Cir. 2010). First, she must show that she is unable to afford counsel. Gilbank has not filed any financial information with the court, so I cannot determine whether she is unable to afford counsel. I will attach to this order a financial affidavit that Gilbank can submit to the court. (The court will also use the financial affidavit to determine whether Gilbank can be exempt from paying PACER fees, as she has requested. Dkt. 16.)

Second, she must show that he made reasonable efforts on her own to find a lawyer to represent her. *Jackson v. County of McLean*, 953 F.2d 1070 (7th Cir. 1992). Gilbank has satisfied this requirement by submitting letters from several lawyers who declined to represent her in this case.

Third, Gilbank must show that the legal and factual difficulty of the case exceeds her ability to prosecute it. *Pruitt*, 503 F.3d at 654–55. The inquiry into a litigant's abilities to handle his own case is a practical one, made in light of "whatever relevant evidence" is available. *Henderson v. Ghosh*, 755 F.3d 559, 565 (7th Cir. 2014). Courts generally consider the litigant's "literacy, communication skills, education level, and litigation experience in light of the complexities of the case." *Pruitt*, 503 F.3d at 655. "The question is not whether a lawyer would present the case more effectively than the pro se plaintiff" but instead whether the pro se litigant can "coherently present [her case] to the judge or jury" herself. *Id.* at 655. Almost all of this court's pro se litigants would benefit from the assistance of counsel, but there are not enough lawyers willing to take these types of cases to give each plaintiff one. I must decide for each case whether the particular plaintiff should be the beneficiary of the limited resources of lawyers willing to respond to courts' requests. *McCaa v. Hamilton*, 959 F.3d 842, 845 (7th Cir. 2020).

Gilbank's filings in this case show that she is intelligent, articulate, and understands the basic facts and legal theories applicable to her case. She has not identified any any reason why this case would be too complex for her to handle on her own. She has requested counsel or a guardian ad litem only so that she can bring claims on behalf of T.E.H. Although I am sympathetic to Gilbank's desire to bring claims on behalf of her minor daughter, I decline to recruit counsel or a guardian ad litem for this purpose. The court has found that it is exceedingly difficult to find counsel or guardians ad litem who are willing and able to accept civil rights cases on a pro bono basis. This is particularly true if counsel would be required to handle the case from start to finish, as would be required in this case, rather than for a limited purpose.

8

App.24

In addition, this court generally does not attempt to recruit counsel until after a case has survived the summary judgment stage, as it is difficult to find counsel willing to accept a case that has undergone no merits review by the court. In this instance, some of Gilbank's claims concern custody and placement decisions taken by government officials, some of which were approved by state court judges. Some of Gilbank's claims may be barred by the *Rooker-Feldman* doctrine, the domestic relations doctrine, issue preclusion, or claim preclusion. *See Kowalski v. Boliker*, 893 F.3d 987, 996 (7th Cir. 2018); *Golden v. Helen Sigman & Assocs.*, Ltd., 611 F.3d 356, 362 (7th Cir. 2010); *Howell v. Dewey*, 817 F. App'x 268, 270 (7th Cir. 2020); *Weinhaus v. Cohen*, 773 F. App'x 314, 316 (7th Cir. 2019). I am not inclined to recruit counsel until this case has undergone additional merits review at the summary judgment stage.

In sum, I have no reason to think that Gilbank cannot represent herself in this case, and I decline to recruit counsel or a guardian ad litem so that T.E.H. may pursue claims. Therefore, I will dismiss T.E.H.'s claims without prejudice. If Gilbank is able to find a guardian ad litem or lawyer to represent T.E.H., she may ask that T.E.H.'s claims be reinstated.

**B. Judge Potter and Judge Brazeau's motion to dismiss**

Gilbank contends that Judge Potter violated her due process rights by refusing to reopen the initial custody hearing, by recusing himself, and by transferring Gilbank's case to Judge Brazeau. She contends that Judge Brazeau violated her due process rights by denying her motion to reopen or to dismiss her criminal case and by continuing the orders regarding T.E.H.'s placement with Hoyle and Gilbank's contact with T.E.H.

Potter and Brazeau have moved for dismissal of the claims against them on the grounds that the claims are barred by Eleventh Amendment sovereign immunity and judicial immunity. I will grant their motions. If Gilbank is suing the judges in their official capacities, her claims

are barred by the Eleventh Amendment. *See Brokaw v. Mercer Cty.*, 235 F.3d 1000, 1009 (7th Cir. 2000) (federal suits against state officials in their official capacities are barred by Eleventh Amendment sovereign immunity). If Gilbank is suing the judges in their individual capacities, her claims are barred by the doctrine of judicial immunity because Gilbank is complaining about Potter's and Brazeau's judicial conduct. *See Stump v. Sparkman*, 435 U.S. 349, 359 (1978); *Loubser v. Thacker*, 440 F.3d 439, 442 (7th Cir. 2006) (judges have absolute immunity for damages claims based on judicial conduct). Therefore, Gilbank's claims against Potter and Brazeau will be dismissed.

## C.  Wood County Defendants' motion to dismiss (Wood County Department of Human Services, Heinzen-Janz, Christensen, La Chappelle, and Mary Solheim)

Defendant Wood County Department of Human Services has moved to dismiss all claims against it on the ground that it is not an entity that may be sued under § 1983. I will grant that motion. State law determines whether a government entity may be sued. Fed. R. Civ. P. 17(b). Under Wisconsin law, municipal departments and subdivisions are arms of the municipality, and cannot be sued. *See, e.g.*, *Whiting v. Marathon Cty. Sheriff's Dep't*, 382 F.3d 700, 704 (7th Cir. 2004) (sheriff's department is not a "legal entity separable from the county government" and thus is not subject to suit under § 1983). Wood County Department of Human Services is a department of Wood County, and it is not a separate entity that may be sued.

The four Wood County social workers—Heinzen-Janz, Christensen, La Chappelle, and Mary Solheim—have moved for dismissal of Gilbank's conspiracy claims brought under 42 U.S.C. § 1986 on the ground that the claims are untimely. Section 1986 creates a cause of action against individuals who conspire to interfere with a person's civil rights. But § 1986 has

a one-year statute of limitations. *Hoagland v. Town of Clear Lake, Ind.*, 415 F.3d 693, 700 (7th Cir. 2005). The county defendants argue that Gilbank's only conspiracy allegations are her allegations regarding Heinzen-Janz's and other social worker's actions to remove T.E.H. from Gilbank in August 2018. They argue that because Gilbank did not file this lawsuit until June 30, 2020, her § 1986 claims are untimely.

I agree with defendants. Although Gilbank alleges in her amended complaint that T.E.H. was not returned to to her until February 2020, and that Wood County social workers refused to help her between August 2019 and February 2020, her amended complaint includes no allegations suggesting that the county defendants engaged in conspiratorial acts within the year before she filed this lawsuit. Therefore, I will dismiss Gilbank's conspiracy claims.

**D. Children's Hospital of Wisconsin's motion to dismiss**

Gilbank contends that Children's Hospital of Wisconsin violated her constitutional rights when it required her to sign a release authorizing T.E.H.'s father, Ian Hoyle, to receive information about Gilbank's visits with T.E.H. Gilbank says that the Children's Hospital staff told her that signing the release was optional, but that she would not get to T.E.H. if she did not sign it. Children's Hospital has moved to dismiss any claims against it on the ground that Gilbank's allegations do not state a federal claim upon which relief may be granted.

I will grant the motion. Gilbank's allegations do not suggest that Children's Hospital was acting in a governmental capacity when it provided the release form to Gilbank, so Gilbank cannot sue Children's Hospital for constitutional violations under § 1983. And even if the hospital was acting in a government capacity, Gilbank's allegations do not suggest that the hospital violated any of her constitutional rights. Nor has Gilbank articulated any constitutional violation. Gilbank referred to HIPAA in her complaint, but individuals cannot

sue to enforce their rights under the Health Insurance Portability and Accountability Act. *Stewart v. Parkview Hosp.*, 940 F.3d 1013, 1015 (7th Cir. 2019). Gilbank also argues that Children's Hospital conspired to deprive her of her civil rights, in violation of 41 U.S.C. § 1986, but her allegations do not support a conspiracy claim against the hospital. And as discussed above, any conspiracy claims are untimely. Therefore, Gilbank's claims against Children's Hospital will be dismissed.

## ORDER

IT IS ORDERED that:

1. The motions to dismiss filed by defendants Nicholas Brazeau, Jr. and Gregory Potter, Dkt. 4 and Dkt. 7, are GRANTED. Brazeau and Potter are DISMISSED from this case.

2. The motion to dismiss filed by defendants Wood County Department of Human Services, Mary Christensen, Theresa Heinzen-Janz, Anne La Chapelle, and Mary Solheim, Dkt. 17 and Dkt. 31, are GRANTED. Wood County Department of Human Services is DISMISSED from this case.

3. The motion to dismiss filed by defendant Children's Hospital of Wisconsin, Dkt. 19, is GRANTED. Children's Hospital is DISMISSED from this case.

4. Plaintiff Michelle Rene Gilbank's motion for an exemption from PACER fees, Dkt. 16, and motion for assistance in recruiting counsel or a guardian ad litem, Dkt. 37, are DENIED without prejudice. The clerk of court shall provide a financial affidavit form to Gilbank.

5. T.E.H.'s claims are DISMISSED without prejudice.

Entered December 15, 2020.

BY THE COURT:

/s/
_____
JAMES D. PETERSON
District Judge

12

App.28

Pro Se 15 (Rev. 12/16) Complaint for Violation of Civil Rights (Non–Prisoner)

# UNITED STATES DISTRICT COURT

for the

Western District of Wisconsin

Civil Division

|  |  |
|---|---|
| MICHELLE R GILBANK, an individual;<br>T. E. H., a minor,<br>    by next friend and mother, Michelle R Gilbank, | Case No.    20-cv-601-jdp |
| *Plaintiff(s)* | *(to be filled in by the Clerk's Office)* |
| **-v-** | **FIRST AMENDED**<br>**COMPLAINT FOR DAMAGES** |
|  | Jury Trial: *(check one)* ☒ Yes ☐ No |
| WOOD COUNTY DEPARTMENT OF HUMAN<br>SERVICES, a government agency;<br>MARSHFIELD POLICE DEPARTMENT, a<br>government agency;<br>CHILDREN'S HOSPITAL OF WISCONSIN, an<br>organization;<br>THERESA HEINZEN-JANZ, an individual and<br>official;<br>DEREK IVERSON, an individual and official;<br>MARY CHRISTENSEN, an individual and official;<br>ANNE LACHAPELLE, an individual and official;<br>MARY SOLHEIM, an individual and official;<br>GREGORY POTTER, an individual and official;<br>NICHOLAS BRAZEAU JR, an individual and<br>official;<br>DOES 1-10, inclusive | |
| *Defendant(s)* | |

## COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

(Non–Prisoner Complaint)

Pro Se 15 (Rev. 12/16) Complaint for Violation of Civil Rights (Non–Prisoner)

---

### NOTICE

Federal Rules of Civil Procedure 5.2 addresses the privacy and security concerns resulting from public access to electronic court files.  Under this rule, papers filed with the court should *not* contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number.  A filing may include *only*: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number.

Except as noted in this form, plaintiff need not send exhibits, affidavits, grievance or witness statements, or any other materials to the Clerk's Office with this complaint.

In order for your complaint to be filed, it must be accompanied by the filing fee or an application to proceed in forma pauperis.

---

I.      **The Parties to This Complaint**

A.      **The Plaintiffs**

Provide the information below for each plaintiff named in the complaint.  Attach additional pages if needed.

| | |
|---|---|
| Name | Michelle R. Gilbank |
| Address | 919 West Blodgett Street |
| | Marshfield      WI      54449 |
| | *City*      *State*      *Zip Code* |
| County | Wood |
| Telephone Number | 715) 660-8740 |
| E-Mail Address | michellegilbank@gmail.com |

| | |
|---|---|
| Name | T.E.H., a minor born 2014 |
| Address | 919 West Blodgett Street |
| | Marshfield      WI      54449 |
| | *City*      *State*      *Zip Code* |
| County | Wood |
| Telephone Number | 715) 660-8740 |
| E-Mail Address | michellegilbank@gmail.com |

Pro Se 15 (Rev. 12/16) Complaint for Violation of Civil Rights (Non–Prisoner)

**B.** **The Defendant(s)**

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation.  For an individual defendant, include the person's job or title (if known) and check whether you are bringing this complaint against them in their individual capacity or official capacity, or both.  Attach additional pages if needed.

Defendant No. 1

| | |
|---|---|
| Name | Wood County Department of <mark>Human</mark> Services |
| Job or Title *(if known)* | a government agency |
| Address | 111 W Jackson St |
| | Wisconsin Rapids |

| | City | State | Zip Code |
|---|---|---|---|
| | Wisconsin Rapids | WI | 54495 |

| | |
|---|---|
| County | Wood |
| Telephone Number | 715) 421-8600 |
| E-Mail Address *(if known)* | |

☐ Individual capacity    ☒ Official capacity

Defendant No. 2

| | |
|---|---|
| Name | Marshfield Police Department |
| Job or Title *(if known)* | a government agency |
| Address | 110 W 1ˢᵗ St |

| | City | State | Zip Code |
|---|---|---|---|
| | Marshfield | WI | 54449 |

| | |
|---|---|
| County | Wood |
| Telephone Number | 715) 384-3113 |
| E-Mail Address *(if known)* | |

☐ Individual capacity    ☒ Official capacity

Defendant No. 3

| | |
|---|---|
| Name | Children's Hospital of Wisconsin |
| Job or Title *(if known)* | an organization |
| Address | 601 S Central Avenue, Suite 200 |

| | City | State | Zip Code |
|---|---|---|---|
| | Marshfield | WI | 54449 |

| | |
|---|---|
| County | Wood |
| Telephone Number | 715) 387-2729 |
| E-Mail Address *(if known)* | NTank@chw.org |

☒ Individual capacity    ☒ Official capacity

App.31

Pro Se 15 (Rev. 12/16) Complaint for Violation of Civil Rights (Non–Prisoner)

Defendant No. 4

| | | | |
|---|---|---|---|
| Name | Theresa Heinzen-Janz | | |
| Job or Title *(if known)* | Social worker at Wood County DHS | | |
| | 111 W Jackson St | | |
| | Wisconsin Rapids | WI | 54495 |
| | *City* | *State* | *Zip Code* |
| County | Wood | | |
| Telephone Number | 715) 421-8600 | | |

☒ Individual capacity  ☒ Official capacity

Defendant No. 5

| | | | |
|---|---|---|---|
| Name | Derek Iverson | | |
| Job or Title *(if known)* | Police detective of Marshfield Police Department | | |
| Address | 110 W 1ˢᵗ St | | |
| | Marshfield | WI | 54449 |
| | *City* | *State* | *Zip Code* |
| County | Wood | | |
| Telephone Number | 715) 384-3113 | | |

☒ Individual capacity  ☒ Official capacity

Defendant No. 6

| | | | |
|---|---|---|---|
| Name | Mary Christensen | | |
| Job or Title *(if known)* | Social worker of Wood County DHS | | |
| Address | 111 W Jackson St | | |
| | Wisconsin Rapids | WI | 54495 |
| | *City* | *State* | *Zip Code* |
| County | Wood | | |
| Telephone Number | 715) 421-8600 | | |

☒ Individual capacity  ☒ Official capacity

Defendant No. 7

| | | | |
|---|---|---|---|
| Name | Anne LaChapelle | | |
| Job or Title *(if known)* | Social worker supervisor of Wood County DHS | | |
| Address | 111 W Jackson St | | |
| | Wisconsin Rapids | WI | 54495 |
| | *City* | *State* | *Zip Code* |
| County | Wood | | |
| Telephone Number | 715) 421-8600 | | |
| E-Mail Address *(if known)* | alachapelle@co.wood.wi.us | | |

☒ Individual capacity  ☒ Official capacity

Pro Se 15 (Rev. 12/16) Complaint for Violation of Civil Rights (Non–Prisoner)

Defendant No. 8

|  | Name | Mary Solheim |  |  |
|---|---|---|---|---|
|  | Job or Title *(if known)* | Social worker supervisor of Wood County DHS |  |  |
|  | Address | 111 W Jackson St |  |  |
|  |  | Wisconsin Rapids | WI | 54495 |
|  |  | *City* | *State* | *Zip Code* |
|  | County | Wood |  |  |
|  | Telephone Number | 715) 421-8600 |  |  |
|  | E-Mail Address *(if known)* | msolheim@co.wood.wi.us |  |  |

☒ Individual capacity    ☒ Official capacity

Defendant No. 9

|  | Name | Gregory Potter |  |  |
|---|---|---|---|---|
|  | Job or Title *(if known)* | Judge of Wood County Circuit Court |  |  |
|  | Address | P.O. Box 8095, Branch 1 |  |  |
|  |  | Wisconsin Rapids | WI | 54495 |
|  |  | *City* | *State* | *Zip Code* |
|  | County | Wood |  |  |
|  | Telephone Number | 715-421-8520 |  |  |

☒ Individual capacity    ☒ Official capacity

Defendant No. 10

|  | Name | Nicholas Brazeau Jr |  |  |
|---|---|---|---|---|
|  | Job or Title *(if known)* | Judge of Wood County Circuit Court |  |  |
|  | Address | P.O. Box 8095, Branch 2 |  |  |
|  |  | Wisconsin Rapids | WI | 54495 |
|  |  | *City* | *State* | *Zip Code* |
|  | County | Wood |  |  |
|  | Telephone Number | 715-421-8518 |  |  |

☒ Individual capacity    ☒ Official capacity

Defendant No. 11-20

|  | Name | Does 1-10 (identities to be determined through discovery) |  |  |
|---|---|---|---|---|
|  | Job or Title *(if known)* |  |  |  |
|  | Address | Unknown |  |  |
|  |  | *City* | *State* | *Zip Code* |
|  | County | Wood |  |  |

☒ Individual capacity    ☒ Official capacity

Pro Se 15 (Rev. 12/16) Complaint for Violation of Civil Rights (Non–Prisoner)

## II.   Basis for Jurisdiction

Under 42 U.S.C. § 1983, you may sue state or local officials for the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]."  Under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971)*, you may sue federal officials for the violation of certain constitutional rights.

A.   Are you bringing suit against *(check all that apply)*:

☒   State or local officials (a § 1983 claim)

B.   Section 1983 allows claims alleging the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]."  42 U.S.C. § 1983.  If you are suing under section 1983, what federal constitutional or statutory right(s) do you claim is/are being violated by state or local officials?

First Cause of Action: Violation of Civil Rights (42 U.S.C § 1983)
>       Count 1: Amendment I – Denial to petition the Government for a redress of grievances
>       Count 2: Amendment IV – Unreasonable, Warrantless Removal without Probable Cause
>       Count 3: Amendment V – Compelled to be Witness Against Self without Due Process of Law
>            Amendment XIV – Deprived of Liberty without Due Process of Law
>            Private Property taken for Public Use without Compensation
>       Count 4: Amendment VI – Denial of Assistance of Counsel
>       Count 5: Amendment VII – Right of Trial by Jury not Preserved
>       Count 6: Amendment VIII – Cruel and Unusual Punishment Inflicted
>       Count 7: Amendment IX – Enumeration of Rights Construed to Deny Other Rights

Second Cause of Action: Conspiracy to Interfere with Civil Rights (42 U.S.C § 1985)
>       Counts 1 – 7 above.

Third Cause of Action: Action for Neglect to Prevent (42 U.S.C § 1986)
>       Counts 1 – 7 above.

Fourth Cause of Action: Violation of HIPAA rights
>       Count 8: Professional Malpractice
>       Count 9: Public Disclosure of Private Facts

Fifth Cause of Action: Monell-Related Claims

D.   Section 1983 allows defendants to be found liable only when they have acted "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia."  42 U.S.C. § 1983.  If you are suing under section 1983, explain how each defendant acted under color of state or local law.  If you are suing under *Bivens*, explain how each defendant acted under color of federal law.  Attach additional pages if needed.

Pro Se 15 (Rev. 12/16) Complaint for Violation of Civil Rights (Non–Prisoner)

All defendants used powers given to them by government agencies to deprive or conspire to deprive plaintiffs of their protected by the Constitution and laws of the United States. All defendants are agencies, organizations, corporations, police officers, social workers, judges or otherwise employees of state agencies and were given powers there of to enforce and uphold the Constitution of the United States and all defendants abused or conspired to abuse these powers, causing harm to plaintiffs.

Plaintiffs MICHELLE R GILBANK and T.E.H., bring this action pursuant to 42 U.S.C. §1983, 42 U.S.C. §1985, 42 U.S.C. §1986, et. seq., to redress the deprivation of rights secured to them under the United States Constitution, including the First, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth and Fourteenth Amendments, and under federal and state law. These deprivations were inflicted by the Defendants herein, and each of them, in some manner. Each of the Defendants herein were at all relevant times acting under color of law.

Because the acts and omissions complained of herein occurred in the County of Wood, State of Wisconsin and it is believed that some living parties currently reside in the County of Wood, State of Wisconsin, venue is proper in the United States District Court for the Western District of Wisconsin. Plaintiffs make the following allegations and claims upon personal belief, investigation, and on information and belief.

DEFENDANT DOES 1 through 10 are sued as fictitious names, their true names and capacities being unknown to Plaintiffs. When ascertained, Plaintiffs will amend this Complaint by inserting their true names and capacities. Each of the fictitiously named Defendants is responsible in some manner for the occurrences herein alleged, and those Defendants proximately caused, are responsible for and/or legally liable for Plaintiffs' damages as herein alleged. Each reference in this complaint to "Defendant," "Defendants," or a specifically named Defendant refers to and includes all Defendants sued under fictitious names.

Plaintiffs make all allegations contained in this Complaint against all Defendants, including DOES 1 through 10.

Whenever reference is made in this complaint to any act of Defendants, such allegations shall be deemed to mean all named Defendants and DOES 1 through 10, or their officers, agents, managers, representatives, employees, heirs, assignees, customers, tenants, who did or authorized such acts while actively engaged in the operation, management, direction or control of the affairs of Defendants and while acting within the course and scope of their duties, except as specifically alleged to the contrary.

At all times herein mentioned and with respect to the specific matters alleged in this Complaint, Plaintiffs are informed and believe that each Defendant (including DOES 1 through 10), was a parent, subsidiary, affiliate, alter ego, partner, agent, franchisee, licensee, employee, employer, controlling franchiser, controlling licensor, principal, and/or joint venturer of each of the remaining Defendants, and was at all times acting within the course and scope of such agency, service, employment, control and/or joint venture, and each defendant has ratified, approved, conspired in, profited from and/or authorized the acts of each of the remaining Defendants and/or failed to prevent such acts when having the power and/or duty to do so, with full knowledge of said acts.

At all times mentioned herein, each of the above identified defendants was an officer and/or agent of the County of Wood and/or the City of Marshfield - as the case may be, and was acting under color of law within the course and scope of their respective duties in doing the things and acts herein alleged.

## III.   Statement of Claim

State as briefly as possible the facts of your case. Describe how each defendant was personally involved in the alleged wrongful action, along with the dates and locations of all relevant events. You may wish to include further details such as the names of other persons involved in the events giving rise to your claims. Do not cite any cases or statutes. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

Pro Se 15 (Rev. 12/16) Complaint for Violation of Civil Rights (Non–Prisoner)

A.      Where did the events giving rise to your claim(s) occur?

 Wood County Courthouse, Wisconsin Rapids, Wisconsin
 Marshfield Police Department, Marshfield, Wisconsin
 704 South Cherry Avenue, Marshfield, Wisconsin
 other locations within Wood County and Marshfield, Wisconsin

B.      What date and approximate time did the events giving rise to your claim(s) occur?

 June 29th, 2018 at approximately 11:00 am through February 2020

C.      What are the facts underlying your claim(s)?  *(For example:  What happened to you?  Who did what?
Was anyone else involved?  Who else saw what happened?)*

As of June 29, 2018, Plaintiff Michelle R Gilbank and her child, T.E.H., constituted a family unit, entitled to constitutional protections, including, but not limited to, the right to live together free of unwarranted governmental interference, the right to familial privacy, and the right of parents to reasonably direct the upbringing of their children.

In addition, Plaintiffs enjoyed a separate and distinct right to live together without undue governmental interference.

As of June 29, 2018, when Marshfield Police Department (MPD) and Wood County Department of Human Services (WCDHS) entered and forever changed their lives, T.E.H. was 4 years old.  Michelle R Gilbank had been properly caring for T.E.H. and enjoyed a strong and loving bond with her.  Michelle had already raised 2 other daughters to be strong, confident, successful members of society.

As of June 29, 2018, Plaintiffs Michelle R Gilbank and T.E.H., had chosen to temporarily reside with T.E.H.'s father, Ian Reid Hoyle.  Mr. Hoyle had a prior conviction of 1st degree sexual assault of a 6-year-old girl and was under court order to have supervised visitation with T.E.H.  He had obtained an attorney and been granted reasonable visitation upon reasonable notice in addition to the supervised visitation. Michelle felt that residing with Mr. Hoyle was necessary to ensure the safety of T.E.H., as she would be present during Mr. Hoyle's additional visitation.

As of June 29, 2018, Mr. Hoyle's drinking and drug use was occurring on a near daily basis and Plaintiffs would frequently have to leave the residence when his behavior became inappropriate or dangerous.

On June 29, 2018, two MPD officers presented themselves at the residence of the Plaintiffs, responding to a welfare request by a neighbor who had witnessed Mr. Hoyle yelling at Plaintiffs and locking them out of the residence.  The officers noted no concern at the time for the safety of either of the Plaintiffs, who were home alone, eating lunch and playing with Legos at the time.  The officers informed Michelle that a county social worker was on the way and they asked Michelle if she would mind if they waited for the social worker in the air-conditioned residence.

On June 29, 2018, Defendant Heinzen-Janz arrived at the residence of Michelle and T.E.H. and was informed by the MPD officers that they had responded to a welfare check and that they had found no cause for concern for the safety of Michelle or T.E.H.  Michelle spoke with Defendant Heinzen-Janz and informed her that although they were safe now, Mr. Hoyle was at work, and there were ongoing safety issues. Michelle requested a meeting with Defendant Heinzen-Janz in order to discuss housing and mental health resources to assist Plaintiffs Michelle and T.E.H. in leaving the residence of Mr. Hoyle due to his abuse and alcohol and drug use.  Defendant Heinzen-Janz scheduled an appointment with Michelle for July 3, 2018 at 1:30 pm at the residence.

Pro Se 15 (Rev. 12/16) Complaint for Violation of Civil Rights (Non–Prisoner)

On July 3rd, 2018, Defendant Heinzen-Janz arrived at Plaintiffs residence at approximately 3:15 pm with Defendant Derek Iverson. Defendant Heinzen-Janz spoke little and offered no support, resources, or inquiry into the safety of the Plaintiffs.  Defendant Iverson badgered Michelle repeatedly and questioned her about her personal drug usage and coerced her to submit to a drug test in her bathroom, which Defendant Heinzen-Janz then forged Michelle's initials on. Michelle was frightened, in shock, and confused as to what was occurring during her meeting to request help, but she was as honest and informed Defendants Heinzen-Janz and Iverson that she had used street drugs in the past to alleviate her PTSD symptoms and that it was one of the reasons she was requesting their help.  Michelle informed defendants Iverson and Heinzen-Janz that she was often fleeing the house with T.E.H. because Mr. Hoyle was high and/or drunk, and that his constant usage was making it difficult for Michelle to maintain sobriety.

Michelle later learned through records requests that Mr. Hoyle, Defendant Heinzen-Janz and Defendant Iverson had been meeting in a gas station parking lot for the two hours that Michelle was patiently waiting for Defendant Heinzen-Janz to arrive and offer Michelle resources. Michelle was offered no resources at this meeting – domestic violence or otherwise – other than 2 phone numbers.  Michelle was not told of any accusations against her. Michelle was not told a child safety investigation was being launched against her. None of Michelle's state of Wisconsin victim rights were followed.  Mr. Hoyle and Defendants Heinzen-Janz and Iverson all denied ever speaking to each other prior to this meeting at the Plaintiffs' residence. Mr. Hoyle informed Michelle that Defendant Iverson (whom Mr. Hoyle called 'Derek') had questioned Mr. Hoyle about Mr. Hoyle's sexual relationship with Michelle and that Defendant Iverson had advised Mr. Hoyle that he should remained close to Michelle but should probable not be having sexual relations with her.

On July 13, 2018, Plaintiffs were on the front porch or their residence and watched Defendants Heinzen-Janz and Iverson park their vehicle at the end of the block of Plaintiffs' residence and then walk down the block before stopping to talk to the Plaintiffs.  Michelle asked the Defendants why they were there and Defendants Heinzen-Janz and Iverson claimed to Michelle that they were simply 'out for a walk'.

On July 26, 2018, Defendant Iverson and Defendant Doe #1, a social worker with WCDHS, arrived at the Plaintiffs' residence upon Mr. Hoyle's request after Mr. Hoyle punched holes in the walls of the residence and ripped his phone in half.  Mr. Hoyle did this while blocking the Plaintiffs' ability to exit the residence, and while T.E.H. clutched Michelle's leg in fear. Defendant Iverson advised Michelle that he could arrest Mr. Hoyle, but that he believed it would probably make the Plaintiffs' living situation more difficult.  Michelle asked if Defendant Iverson could find out if Mr. Hoyle was returning to the residence, and upon learning that Mr. Hoyle was at a bar drinking, Defendant Iverson suggested to Michelle that her and T.E.H. sleep in the garage that night in order to be safe. Defendant Iverson did not file a report on this incident, Michelle later learned when requesting records.  Domestic violence laws, and department rules and regulations were not followed.  Michelle later called Defendant Iverson's supervisor inquiring as to why a report was not filed and was told that Defendant Iverson must not have felt that the incident rose to the level of domestic violence.

Mr. Hoyle was drunk and/or high on the 1st, 9th, 13th, 14th, 15th, 16th, 18th, 19th, 23rd, 26th, 27th, 28th, 29th, and 30th of July.

On August 18, 2018, after telling him 'no' several times, and being woken continuously throughout the night to fight him off from removing her clothes in her sleep, Michelle woke in the morning to find Mr. Hoyle naked and masturbating to porn in the middle of the living room with T.E.H. right next to him. Michelle took T.E.H. and left.

Pro Se 15 (Rev. 12/16) Complaint for Violation of Civil Rights (Non–Prisoner)

3 days later, On August 21, 2018, Mr. Hoyle requested a ride to work from Michelle, which she provided. During this ride, Michelle informed Mr. Hoyle that she and T.E.H. were leaving him and that they had an appointment for housing assistance that morning.  Plaintiffs then drove to the housing appointment at North Central Community Action. On the way, at approximately 10:40 am, Plaintiffs passed an MPD officer (Libby Abel) parked on the side of the street at a stop sign at the end of Plaintiffs' block.  Michelle nodded to the officer in acknowledgement and respect before stopping at the stop sign and then continuing on her way, four blocks forward to the Marshfield Community Center.

Upon information and beliefs, Officer Abel then radioed Defendant Iverson, stating that "we had eluded her and requesting assistance in locating us". Defendant Iverson then reports that he conducted surveillance of the Plaintiffs while they were at their appointment.  Defendant Iverson then radioed back to the Officer Abel approximately one hour later that we had left the Marshfield Community Center and were headed north. Approximately 15 blocks later Plaintiffs were pulled over by officer Abel who had already called for a k9 officer to interrupt his lunch hour and come to the scene. Michelle was informed that her license had been suspended (a traffic infringement) 3 days prior for failure to pay a $10 ticket for not having proof of insurance in her vehicle. Officer Abel wrote Michelle another ticket and again radioed to see if the k9 officer was enroute, lengthening the traffic stop.  The k9 officer subsequently arrived and told Michelle to remain in the vehicle and place her hands on the steering wheel, effectively placing her under arrest without probable cause.  The k9 officer walked the dog around Michelle's vehicle multiple times and then kicked the rear passenger door of the Plaintiffs' vehicle. At this time Michelle was told to exit the vehicle. Michelle unbuckled T.E.H. from her child restraint and grabbed her purse and was told to leave her purse in the vehicle. Michelle complied and sat down in the grass with T.E.H.

Michelle then called Mr. Hoyle and Mr. Hoyle's mother and her friend who was a parent and asked them to come to the scene in order to take T.E.H. and care for her while Michelle figured out what was happening. T.E.H. left the scene in perfect physical and mental health and condition in the care of 3 others – care arranged by her protective custodial mother, Michelle.

Michelle later learned, through information and belief, that Mr. Hoyle drove directly to his attorney's office and filed for sole custody and termination of child support.  Mr. Hoyle's attorney efiled these motions, stating that the reason for the motions was that Michelle had been charged with possession of methamphetamine and arrested.  The timestamp on these court documents shows that they had been filed before the vehicle search had even been completed, before Michelle was questioned, and before Michelle was even charged with anything.

Through information and belief, Mr. Hoyle has conspired with and weaponized the services of Defendants Heinzen-Janz and Iverson and others yet to be known, all of whom acted under color of law, in order to obtain unsupervised custody of his 4-year-old daughter, T.E.H.  Custody he had tried and thus far failed to obtain through family court due to his status as a convicted sex offender of a 6-year-old girl.

Pro Se 15 (Rev. 12/16) Complaint for Violation of Civil Rights (Non–Prisoner)

On August 21, 2018, at approximately 2:30 pm, Michelle was told she was being charged with possession of methamphetamine and was taken to MPD and questioned by Defendant Iverson in the presence of Defendant Heinzen-Janz.  This questioning was video-recorded.  No drug test was requested of Michelle.  No charges of impaired operation of a motor vehicle were ever sought.

Michelle cooperated fully with Defendant Iverson's questioning.  When Defendant Iverson asked Michelle about drugs found in her minivan, Michelle responded that she did not know of any drugs. Defendant Iverson related to Michelle that he did not believe her and badgered her further.  Michelle then asked to speak to an attorney. Defendant Heinzen-Janz was present and after hearing Michelle's request for an attorney, Defendant Heinzen-Janz spoke up and said "if you do not admit guilt and continue to cooperate with us, then I have no choice but to find that you are refusing to cooperate with a safety plan and are therefore a danger to your child and remove her from your care and place her with her father." (**Count 4 and Count 7**)

This was the first time Michelle had ever heard the words 'safety-plan'...the first time she was made aware of any ongoing case regarding T.E.H. at all.  Michelle had no knowledge of her ex-partner's involvement or accusations.  Michelle was then booked into custody by the MPD Officer Abel. Michelle was not given the attorney she had requested.  Instead, T.E.H. was kidnapped and given to the Plaintiffs' abuser – who had court-ordered supervised visitation at the time – without a warrant or any immediate threat of danger. In fact, Defendants were aware that Michelle was being arrested, and if, in fact, Michelle posed any immediate threat to T.E.H. – Michelle would be detained from T.E.H.'s presence for plenty of time for a warrant to be obtained if evidence did, in fact warrant removal. Michelle was also evicted unlawfully from her residence and all her possessions and daughter were placed with the man who had tormented them.

On August 21, 2018, Mr. Hoyle, Defendants Heinzen-Janz, Iverson, MPD, WCDHS, LaChapelle, and unknown others; each of them, discussed T.E.H.'s proposed seizure and removal from Plaintiff's custody.  Defendants Heinzen-Janz, Iverson, MPD, WCDHS, LaChapelle, and unknown others; each of them, agreed to seize T.E.H. from her mother's care, without prior judicial authorization and/or court order. At the time they seized the child, T.E.H., they knew, as any reasonable government official would, that it is unlawful to seize a child from the custody of its parents without first obtaining a warrant, unless at the time of the seizure the government agent is in possession of specific and articulable evidence to show that the child is in immediate danger of suffering severe bodily injury or death in the time it takes to obtain a warrant - and, that there is no lesser intrusive alternative means of averting that specific injury. – **Counts 2, 3, 4, and 7.**

On August 21, 2018, Michelle was given papers which stated that T.E.H. was in the custody of the state and that placement had been given to her father, Mr. Hoyle.  The papers stated that Michelle was under a no-contact order and could not return home. Papers stated that there would be a hearing within 48 hours to contest this custody.

On August 22, 2018, Michelle was bailed out of jail.

On August 23, 2018, Michelle returned to the courthouse to inquire as to the 48-hour hearing and she learned that it had been held without her knowledge.  Upon information and belief, she learned that the Defendants, Heinzen-Janz and Iverson, had committed felonies by giving false information to to the court to justify their emergency removal of T.E.H. with a warrant or probable cause.  (**Count 3**)

On August 24, 2018, Michelle wrote a letter to the judge (Defendant Gregory Potter) declaring that she contested the action and detailing the laws and Constitutional rights being violated of the Plaintiffs, and requesting that he take action to correct them.  Instead, Defendant Potter recused himself from the case and transferred it to another judge, Defendant Brazeau, who was on vacation for two weeks.

Pro Se 15 (Rev. 12/16) Complaint for Violation of Civil Rights (Non–Prisoner)

**Count 1** – In refusing to reopen Plaintiffs' initial probable cause hearing after being denied due process, Defendants Potter and Brazeau denied Plaintiffs' right to petition the government for a redress of grievances.  Defendants Potter and Brazeau also had the authority and ability to prevent further violation of Plaintiffs' rights - they knew, as any reasonable government official would, that it is unlawful to seize a child from the custody of its parents without first obtaining a warrant, unless at the time of the seizure the government agent is in possession of specific and articulable evidence to show that the child is in immediate danger of suffering severe bodily injury or death in the time it takes to obtain a warrant - and, that there is no lesser intrusive alternative means of averting that specific injury. (**3rd cause of action**)

On August 29, 2018, Michelle ordered transcripts of the probable cause hearing held in her absence from Wood County courthouse.

On August 31, 2018, Plaintiff's saw each other for the first time since the kidnapping – for a 4-hour visit at WCDHS – in which Plaintiffs were left alone in a room for the majority of the time.  This was TEN days since the unlawful separation of the Plaintiffs.  On this day also, Michelle received a notice of her rights via US mail.  This notice was required by law to have been given to Michelle prior to T.E.H.'s removal. (**Counts 5 and 6**)

On September 6th, 2018, Michelle underwent an interview with Defendant Children's Hospital of Wisconsin (CHW).  During this interview Michelle was given a release form to sign, releasing information on the Plaintiffs' visits to Mr. Hoyle.  At the bottom of the form, it stated that signing this release was optional.  Michelle informed CHW that she was not comfortable with her abusive ex-partner having this information.  CHW informed Michelle that if she did not sign the release, then CHW would not provide services to her – ie. Michelle would not see T.E.H. (**Count 8 and Count 9**)

In September, 2018, Michelle filed formal requests for dismissal and a request for reopening of the hearing, as procedures of state law indicated she should.  Both motions were heard and denied by the Defendant Brazeau.  Defendant Brazeau knew, as any reasonable government official would, that Michelle was required by law to be notified of the probable cause hearing, and that she had the right to reopen the hearing if she had not attended for any reason.

On September 25, 2018, Plaintiffs were given a "fact finding" hearing, where no facts were presented and all witnesses testified that Michelle was a good mother, and that T.E.H. was well cared for and healthy. T.E.H. had just had her 4-year well-child checkup. Michelle had collected affidavits testifying to her excellent parenting from her ex-husband, her adult daughters, and even Mr. Hoyle.

Defendant Heinzen-Janz testified that because Michelle had tested positive on a drug test on July 3, 2018, Michelle obviously had an addiction that was out of control and that she refused to admit to.  This had been the only positive drug test Michelle had ever had in her life. Michelle had repeatedly requested to see the results of the positive test and was denied.  Upon final seeing the urinalysis that was obtained under duress, Michelle noticed that her initials were forged at the bottom.  It is Michelle's belief that Defendant Heinzen-Janz forged these initials.  Defendant Heinzen-Janz failed to inform the court that at the time of the positive test, Michelle was actively seeking help in fleeing from the drug-present environment from Defendant Heinzen-Janz herself.  Mr. Hoyle testified that he had once seen Michelle use drugs 3 years ago, and that he had used drugs one year ago. The public defender that had appeared for Michelle without ever meeting with her, summarized for the court that the state had **obviously** not proven it's burden that I was neglectful.

Defendant Brazeau ruled "I disagree, In my experience, drug addicts LIE. I find it remarkable that the child has not sustained injury in her mother's care up to this point and I will prevent it in the future by continuing the existing orders." There had been No Evidence Presented. T.E.H. was left in the sole care of Mr. Hoyle – an admitted sex addict and offender, alcoholic, and drug user.

Pro Se 15 (Rev. 12/16) Complaint for Violation of Civil Rights (Non–Prisoner)

The ongoing services social worker Defendant Mary Christensen informed Michelle that if Michelle did not let go of what WCDHS has done to Michelle then Michelle would never get her daughter back. Defendant Christensen supports this statement with continuing restrictions and reductions in visits whenever Michelle attempts to protect T.E.H. or stand up to Plaintiffs rights being violated. (retaliation) (**Count 4**)

Upon information and belief, Mr. Hoyle had been secretly conspiring with Defendants Heinzen-Janz and Iverson and Defendant Iverson counseled Mr. Hoyle that " he should probably not be having actual intercourse with Michelle, but should try harder to get along with her." Defendant Iverson was fully aware Mr. Hoyle was maintaining a fraudulent sexual relationship in an attempt to use Michelle's trust and vulnerability to obtain sole custody of T.E.H..  The paraphernalia found in Michelle's vehicle is described in these transcripts between Mr. Hoyle and Defendants Heinzen-Janz and Iverson as being in Mr. Hoyle's possession two weeks prior to Michelle's traffic stop.

Upon information and belief, email exchanges occurred between Defendant Heinzen-Janz, Defendant Christensen, and Mr. Hoyle in which they share information of my urine test and mental health prescriptions – all in violation of HIPAA law. The initial services social worker, Defendant Heinzen-Janz, actually sent out a "to whom it may concern" email to any and all WCDHS workers who might possibly be called upon to help Michelle in the future.  In this email, Defendant Heinzen-Janz slanders Michelle and calls her delusional and in denial.  Essentially, attempting to ensure that Plaintiffs receive NO HELP at all after she herself refused to help them.  Defendant Heinzen-Janz and Defendant Christensen also exchanged personal emails with Mr. Hoyle discussing their personal lives and shared contacts and relationship issues.  (**Count 8 and Count 9**)

Plaintiffs have gone through the formal complaint process at both the local (Defendant Anne LaChapelle) and the state (Defendant Mary Solheim) level to no avail.  Defendant Solheim's final review stated that 'although not admitting guilt, a review of policies is always beneficial for staff and would be done, which should alleviate Plaintiffs' fear that this could happen to another family.'

Mchelle was placed on a state registry and can no longer work with children or elderly.  She appealed this decision and it was upheld with no reasoning or review as is required by state law.
*Wisconsin Administrative Code DCF 40.03 -  Review of an initial determination.*
*(1)  NOTICE. If an agency makes an initial determination that a specific person has abused or neglected a child, the agency **shall** send by first class mail all of the following information to the person by the next working day:*
*(a) A summary of the initial determination that includes the name of the child involved in the alleged incident and **the reasons for the agency's determination that the person who is the subject of the initial determination has abused or neglected the child**.* (Count 4)

Michelle appealed the ChIPS order, and her appeal was denied to be heard. After being told for a year by WCDHS that the goal of the ChIPS order was reunification, Plaintiffs' ChIPS order was closed and they were told that reunification was not necessary because WCDHS were recommending that T.E.H. be placed with a parent, Mr. Hoyle. (All Counts)

Upon information and belief, Plaintiffs believe reunification did not occur due to conspiracy to violate their rights and in retaliation for Plaintiffs ongoing attempts to correct these violations.
At the time of the seizure of T.E.H., other more reasonable and less intrusive alternative means existed to secure the child's safety other than her unwarranted seizure and removal from the loving care of her mother. In spite of this, these Defendants, and each of them intentionally, or with reckless or malicious disregard for Plaintiffs' rights, failed and/or refused to pursue or investigate any such lesser intrusive alternative means of keeping the family together. Instead, Defendants Heinzen-Janz and Iverson, and each of them seized T.E.H. – without judicial authorization, and without evidence of any underlying exigent circumstance.

Pro Se 15 (Rev. 12/16) Complaint for Violation of Civil Rights (Non–Prisoner)

## FIRST CAUSE OF ACTION - Violation of Civil Rights {42 U.S.C. §1983}
## SECOND CAUSE OF ACTION - Conspiracy to Interfere with Civil Rights (42 U.S.C § 1985}
### COUNTS 2, 3, 4, 6, 7
(Unlawful Seizure, Invasion of Privacy, Interruption of Familial Association/Failure to Intercede, Compelled to be Witness Against Self without Due Process of Law, Deprived of Liberty without Substantial or Procedural Due Process of Law, Private Property taken for Public Use without Compensation, Denial of Assistance of Counsel, Cruel and Unusual Punishment Inflicted, Enumeration of Rights Construed to Deny Other Rights)
### By PLAINTIFFS MICHELLE R GILBANK AND T.E.H.
Against Defendants HEINZEN-JANZ, IVERSON, CHRISTENSEN, LACHAPELLE, SOLHEIM, POTTER, BRAZEAU, and DOES' 1 through 10, inclusive

Plaintiffs Michelle R Gilbank and T.E.H. incorporate the above allegations of fact and law as though fully set forth herein.

Plaintiffs Michelle R Gilbank and T.E.H. are individuals and citizens of the United States, protected by 42 U.S.C. §1983, and 42 U.S.C. §1985, et seq.

At all times relevant herein, the right to familial association guaranteed under the First and Fourteenth Amendments to the United States Constitution was so very "clearly established" that any reasonable social services agent and/or police officer or other law enforcement officer in Defendants' situation would know it is unlawful to seize a child from the care, custody, and control of its parent or to question, threaten, examine, or search a child in the absence of exigent circumstances without first obtaining a warrant to do so.  Furthermore, any such reasonable social worker and/or police officer would know that to do so would constitute a violation of the parent's, and child's, well elaborated constitutional right to live together without governmental interference - which rights are protected under the First and Fourteenth Amendments to the United States Constitution.

Defendants, and each of them, had, at all times relevant herein. an affirmative duty and obligation to recognize, acknowledge, and respect the Plaintiffs' rights, and to conduct themselves in a manner that confirms, provides for the preservation of, and does not violate the rights guaranteed Plaintiffs under the United States Constitution, including, without limitation, the protection of parental rights, the right to privacy, family integrity and the right to familial relations.

Defendants, and each of them, at all relevant times herein were acting under color of state law when they jointly acted, or knew and agreed and thereby conspired, to violate Plaintiffs' constitutional rights by, but not limited to, removing, detaining, and continuing to detain T.E.H. from the care, custody, and control of her parent, without proper or just cause and/or authority, in the absence of any exigency, and without first obtaining a warrant or other court order - thereby violating Plaintiffs' rights under the First and Fourteenth Amendments to the United States Constitution.

None of the Defendants sought, or obtained, a protective custody warrant - or any other type of warrant or court order, prior to seizing T.E.H.

Defendants, and each of them, jointly acted or conspired to seize the child, as described above, knowing that no warrant authorizing child's seizure had been issued and that exigent circumstances did not exist They also knew that Michelle had not consented to said unwarranted seizure.

At no time ever did any of the Defendants have any specific, articulable evidence to support any reasonable basis to believe that T.E.H. was in immediate danger of sustaining serious bodily injury or death within the time it would have taken the Defendants to seek and obtain a warrant authorizing the child's seizure. Indeed, Plaintiffs are informed and believe and thereon allege that Defendants, and each of them, purposefully, knowingly, and/or recklessly failed to seek a warrant, in knowing contravention and derogation of Plaintiffs' clearly established rights to due process and familial association.

In the alternative, with respect to HEINZEN-JANZ, through her extensive training as an WCDHS social worker, on information and belief, she was equally aware of the aforementioned constitutional rights of parents and children to live together without government interference. On information and belief, she was equally aware through her training and experience that she had an affirmative obligation to intercede and intervene to protect the rights of citizens, like Plaintiffs, when she witnessed constitutional rights being violated by other government agents. Not only did she stand by and fail to intercede and intervene on Plaintiffs' behalf - she went so far as to provide agreement, concurrence, and support for IVERSON when together they seized T.E.H. from the custody of her parent without a warrant and in the absence of any exigency.

In the alternative, with respect to Detective IVERSON, through his extensive training as a detective, on information and belief, he was aware of the aforementioned constitutional rights of parents and children to live together without government interference. On information and belief, he was equally aware through his training and experience that he had an affirmative obligation to intercede and intervene to protect the rights of citizens, like Plaintiffs, when he witnessed their constitutional rights being violated by fellow officers. Not only did he stand by and fail to intercede and intervene on Plaintiffs' behalf- he went so far as to provide agreement, concurrence, and armed support for HEINZEN-JANZ when together they seized T.E.H. without a warrant and in the absence of any exigency.

No reasonable government agent in Defendants' position could have believed that their conduct, i.e., agreeing to and supporting and/or failing to intercede or intervene to stop the unwarranted seizure of T.E.H., under the circumstances then presented was lawful.
As a direct and proximate result of these Defendants' misconduct, Plaintiffs have suffered and will continue to suffer, general and special damages according to proof at trial, including but not limited to, physical and/or mental anxiety, emotional distress, pain and anguish, among other things.
Due to the malicious, wanton, callous, reckless, wrongful and despicable nature of the Defendants' misconduct, as herein alleged and described, Plaintiffs are entitled to recover, and shall seek, punitive damages against the individual Defendants, and each of them, in accordance-with-law and subject to proof at trial.

SECOND CAUSE OF ACTION -*Monell*-Related Claims
**COUNT 1**
By PLAINTIFFS MICHELLE R GILBANK AND T.E.H.
Against MARSHFIELD POLICE DEPARTMENT

Plaintiffs incorporate the above allegations of fact and law as though fully set forth herein.
Defendant Marshfield Police Department, is a "person" within the meaning of **42 U.S.C. §1983** and subject to *Monell* liability.  *Monell v. Dept. of Social Services* (1978) 436 U.S. 658.
Defendants, and each of them, acted under color of state law when committing the acts herein, in violation, in violation of Michelle R Gilbank and T.E.H.'s rights.
Defendant Marshfield Police Department, and those individuals in their official capacity who had supervisory and/or policy making authority, had a duty to Plaintiffs to establish, implement and follow policies, procedures, customs and/or practices which confirm and provide the protections guaranteed Plaintiffs under the United States Constitution, including those under the First and Fourteenth Amendments. This includes, without limitation, the protection of the right to familial relations; the right to privacy; and the rights to substantive and procedural due process.
Defendant Marshfield Police Department, also had a duty to use reasonable care to select, assign, supervise, train, control and review the activities of all their agents, officers, employees and those acting under them, so as to protect these constitutional rights; and to refrain from acting with deliberate indifference to the constitutional rights of Plaintiffs in order to avoid causing the injuries and damages alleged herein.

Pro Se 15 (Rev. 12/16) Complaint for Violation of Civil Rights (Non–Prisoner)

Moreover, based on the duties charged to the Marshfield Police Department and its officers, including the powers to seize children from their parents' care, MPD and its policymaking officials knew or should have known of the need to establish customs, policies, and practices required to protect the aforementioned civil rights of parents and their children with whom their agents regularly came into contact - and to adequately train its employees on constitutionally appropriate policies and practices. Defendant Marshfield Police Department established, adopted, followed, and/or implemented and/or turned a blind eye to customs, and/or practices which were followed, complied with, and carried out by the Marshfield Police Department officers when they violated Plaintiffs' constitutional rights by seizing T.E.H. from Plaintiff's care and custody without first obtaining a warrant where the child was in no danger of suffering severe bodily injury or death in the time it would have taken to obtain a warrant, among other things.

In addition, Defendant Marshfield Police Department established. Adopted, followed, and/or implemented and/or turned a blind eye to customs, and/or practices which were followed, complied with, and carried out by the Marshfield Police Department officers when they violated Plaintiffs' constitutional rights by continuing to detain T.E.H. and/or by causing T.E.H. to continue to be detained from Plaintiff's custody when it was known that there was not a basis to do so.

At the time of the underlying events, the regularly established customs and practices of the Marshfield Police Department were followed, adhered to, complied with, and carried out by IVERSON, and each of them, were the moving force, that is, the actual, direct, and proximate cause of the violations of Plaintiffs' constitutional rights including, but not limited to:

1. The custom and/or practice of detaining and/or removing children from the custody of their parents in the absence of exigent circumstances (immediate danger of serious bodily injury), without first obtaining a court order/warrant, without first engaging in a reasonable investigation, and/or first obtaining consent of the child's parent;

2. The policy, custom, and/or practice of removing children from their family and their homes without first performing and/or pursuing any and/or reasonable investigation, and then only investigating allegations of abuse, after the unwarranted seizure is *fait accompli*;

3. The policy, custom, and/or practice of removing and detaining children, and continuing to detain them for an unreasonable period long after any alleged basis for detention is negated or otherwise known to lack merit;

4. The policy, custom, and/or practice of causing the continued detention of a child to be prolonged even though there is no factual basis to support the continued detention of the child;

5. The practice of turning a deliberate blind eye to the need for further or adequate training by ignoring repeated violations of the rights of children and parents with whom MPD officers can regularly be expected to come into contact by failing and/or refusing to implement a practice of regular and adequate training and/or supervision, and/or failing to train and/or supervise its officers, agents, employees and state actors, in providing and ensuring compliance with the constitutional protections guaranteed to individuals, including those under the First and Fourteenth Amendments to the United States Constitution.[2]

Each of the above enumerated customs, policies, or practices is evidenced by the consistent failure on the part of Marshfield Police Department to investigate violations of constitutional rights by law enforcement officers of a similar nature; and, the consistent failure by Marshfield Police Department to discipline its officers and their supervisors who are involved in constitutional violations of a similar nature so that violations of citizen's constitutional rights have not only become accepted, but are customary.

[2] This list is not exhaustive due to the pending nature of discovery and the privileged and protected records of investigative and juvenile dependency type proceedings. Plaintiffs may seek leave to amend this pleading as more information becomes available.

Pro Se 15 (Rev. 12/16) Complaint for Violation of Civil Rights (Non–Prisoner)

On information and belief, Defendant Marshfield Police Department has engaged in each of the customs and/or practices identified above on an ongoing and continuous basis since at least 2010, if not-earlier, and continues to engage in these practices on an ongoing and daily basis.

Defendant Marshfield Police Department is aware that its officers seize children from the care of their parent without first obtaining judicial authorization, parental consent, and/or pursuing reasonable avenues of investigation, when there is no emergency circumstance and in contravention of the rights of both parents and children. Yet, Defendant Marshfield Police Department made a knowing and conscious decision to refrain from promulgating a policy and recurrent training to prevent such misconduct, and has consistently and knowingly failed to provide any training to their officers to inform them of the rights of parents and children to remain together absent undue government interference, the obligation of the officers to first obtain a warrant before seizing children from their parents when no exigency exists.

Defendant Marshfield Police Department failed to establish, adopt, and/or implement policies, procedures, and training regarding the constitutional protections afforded to a parent and child by the First and Fourteenth Amendments. Without such policies, procedures, customs and/or practices in place, the Marshfield Police Department's law enforcement officers were allowed and permitted to engage in conduct that was in violation of Plaintiffs' constitutional rights as more specifically set out in the General Allegations above.

On information and belief, the Defendant Marshfield Police Department's failure to adopt such policies and training was the moving force behind the violations of Plaintiff's constitutional rights. Such failures include, but are not limited to:

1. The Marshfield Police Department had no written policy, procedure, custom, practice and/or training regarding the circumstance under which a law enforcement officer must obtain judicial authorization prior to removing a child from the custody of its parent while there is documented domestic abuse in the home;

2. Marshfield Police Department had no written policy, procedure, custom, practice and/or training requiring a law enforcement officer to obtain judicial authorization prior to removing a child from the custody of its parent(s), when there was no evidence that the child was in immediate risk of suffering serious bodily injury at the hands of its parent(s);

3. Marshfield Police Department had no written policy, procedure, custom, or practice to require recurrent training of its law enforcement officers delineating the constitutional protections afforded to a parent and child by the First, Fourth. and Fourteenth Amendments;

4. Marshfield Police Department had no written policy, procedure, custom, or practice to require recurrent training of its law enforcement officers to instruct them that they must possess "specific, articulable evidence" that a child would be placed at immediate risk of suffering serious harm at the hands of the parent(s), prior to removing the child from its parent's custody without judicial authorization;

5. Marshfield Police Department had no written policy, procedure, custom, or practice to require recurrent training of its law enforcement officers instructing that a law enforcement officer must pursue reasonable avenues of investigation before removing a child from the custody of its parent(s), when there was no evidence that the child was in immediate risk of suffering serious bodily injury.

Pro Se 15 (Rev. 12/16) Complaint for Violation of Civil Rights (Non–Prisoner)

By deliberately refraining from promulgating any of the aforementioned policies, procedures, customs, practices and/or training, Marshfield Police Department permitted the aforementioned basic policy decisions to be made by the lower level law enforcement officers in the field.  As a result, the Defendant Marshfield Police Department's policy, custom, and/or practice – as established, adopted, and implemented by the Police Department Defendants - was to detain a child from its parent without judicial authorization, parental consent, and without specific, articulable evidence to suggest that the child is in immediate risk of suffering serious bodily injury at the hands of that parent, and then to continue to detain the child even though they knew there was no legitimate basis to do so, and then to continue to detain the child or otherwise cause the continued detention of the child even thought it was known that there was no factual basis to do so.

The state of the law regarding the constitutional protections afforded to a parent and child by the First and Fourteenth Amendments was clearly established well before August 2018. As such, the Defendant Marshfield Police Department knew before 2018 that its law enforcement officers required recurrent training on the constitutional protections afforded to a parent and child.  On information and belief, despite this knowledge, the Defendant Marshfield Police Department deliberately failed to train or, alternatively, deliberately failed to provide recurrent and updated training to its law enforcement officers on the following constitutional protections:

1. The Marshfield Police Department did not provide recurrent training to its law enforcement officers regarding the circumstances under which judicial authorization must be obtained prior to removing a child from the custody of its parent;
2. The Marshfield Police Department did not provide recurrent training to its law enforcement officers regarding the fact that judicial authorization must be obtained prior to removing a child from the custody of its parent, when there was no evidence that the child was in immediate risk of suffering serious bodily injury;
3. The Marshfield Police Department did not provide training to its law enforcement officers on the well-established constitutional protections afforded to a parent and child by the First and Fourteenth Amendments.

The Defendant Marshfield Police Department's deliberate failure to train its law enforcement officers on these established constitutional protections was a substantial factor in causing the Plaintiffs harm, in that officers working for the Defendant Marshfield Police Department were unfamiliar with and oblivious to the Plaintiff's constitutional rights, when the MPD deputies and/or detectives, seized T.E.H., without judicial authorization, parental consent, and in the absence of exigent circumstances.

The Defendant Marshfield Police Department's decision to disregard these constitutional protections in the face of a known need for such policies to prevent the specific misconduct alleged herein above, i.e., the known need for a specific policy prohibiting the aforementioned misconduct, is itself a "policy" decision which constitutes a policy of deliberate indifference.

This policy of deliberate indifference, and the lack of prophylactic policies and training in the face of a known need for such policies and training was a substantial factor in causing the Plaintiffs harm, in that the Marshfield Police Department and its officers followed and acted pursuant to the regularly established customs, practices, and well known and accepted standard operating procedures of the Marshfield Police Department when they seized T.E.H. from her mother's custody and care without judicial authorization, parental consent, and without specific, reasonable, and articulable evidence to suggest that either child was in immediate risk of suffering serious bodily injury - none of which was constitutionally permissible.

Plaintiff is informed and believes that, the Defendant Marshfield Police Department never investigates, reprimands, disciplines, and/or discharges its law enforcement officers who engage in the type of conduct alleged herein. Plaintiff is informed and believes that, Marshfield Police Department has refused and continues to refuse to admit that its officers commit a constitutional violation when they engage in the type of conduct alleged herein.

These actions, and/or inactions, of Marshfield Police Department were the moving force behind, and direct and proximate cause of Plaintiffs' injuries, as alleged herein; and as a result, Plaintiffs have sustained general and special damages, to an extent and in an amount to be proven at trial. In addition, Plaintiffs have incurred, and will continue to incur, attorneys' fees, costs and expenses, including those as authorized by 42 U.S.C. § 1988, to an extent and in an amount subject to proof at trial.

### COUNT 2
By PLAINTIFFS MICHELLE R GILBANK AND T.E.H.
Against WOOD COUNTY DHS, CHILDREN'S HOSPITAL OF WISCONSIN,
and DOES 1 through 10, inclusive

Plaintiffs Michelle R Gilbank and T.E.H. incorporate the above allegations of fact and law as though fully set forth herein.

Defendants, and each of them, had, and have, an affirmative duty and obligation to recognize, acknowledge, and respect the constitutional rights of Plaintiffs, and to conduct themselves in a manner that confirms, provides for the preservation of, and does not violate their rights. These rights include, without limitation, the right to privacy, family integrity and the right to remain free of non-consensual unwarranted seizure, all arising under the First and Fourteenth Amendments to the United States Constitution. Moreover, Defendants' employees and/or agents who, in their official capacity had supervisory and/or policy making authority, shared duties identical to those of their respective employers.

The above listed constitutional mandates apply equally to government and to those private persons who are willful or voluntary participants with the government in violating laws and the constitutional rights of parents and children placed under their supervision. *See Dennis v. Sparks*, 449 U.S. 24, 27 (1980).

As detailed above, Defendant CHW regularly and systematically restricted families from enjoying their rights to family integrity and violated the privacy rights of parents and children in doing so, pursuant to contract, and at the behest and direction of WCDHS. Defendant CHW is paid money by WCDHS for these services and regularly cooperates in joint action with government to investigate and document allegations of child abuse - which is a traditional governmental function.

The Defendants, and each of them, also had a duty to use reasonable care to select, assign, supervise, train, control and review the activities of all its agents, officers, employees and those acting under them, so as to protect the constitutional rights of Plaintiffs and to refrain from acting with deliberate indifference to the constitutional rights of Plaintiffs in order to avoid causing the injuries and damages alleged herein.

Based on the duties charged to the Defendants, and each of them, their policymaking officials knew or should have known of the need to establish such customs, policies, and practices as were required to protect the aforementioned constitutional rights of children with whom the Defendants and their employees and/or agents regularly came into contact.

Pro Se 15 (Rev. 12/16) Complaint for Violation of Civil Rights (Non–Prisoner)

At the time of the underlying events, the regularly established customs and practices of the Defendants. and each of them, that were followed, adhered to, complied with, and carried out by their employees, agents, and contractors, were the moving force that caused the violations of the constitutional rights of Plaintiffs including, but not limited to the following policies, customs, and/or practices:

1. The custom and/or practice of subjecting children to unwarranted restrictions on the liberties and integrity of their family;
2. The custom and/or practice to directly interfere with the right of a parent raise their child with unwarranted government intrusion;
3. The custom and practice of interfering in the integrity of the parent/child relationship pursuant to contract and at the behest of WCDHS without any independent determination and/or consideration as to whether the interference is appropriate and/or necessary.
4. The unwritten policy of acting with deliberate indifference to the rights of children and parents with whom Defendants agents can regularly be expected to come into contact by failing and/or refusing to implement a practice of regular and adequate training and/or supervision, and/or by failing to train and/or supervise their respective officers, contractors, agents, and/or employees, in providing and ensuring compliance with the constitutional protections guaranteed to individuals, including those under the First, Fourth, and Fourteenth Amendments, when performing actions related to child abuse investigations. [3]

Defendants, and each of them, never investigate or discipline its employees, doctors, contractors, and/or agents who interfere with families' constitutional rights - without consent, court order, exigency, and/or inquire to determine whether there was a basis to perform the services. Defendants, and each of them, did not investigate or discipline the employees, doctors, contractors, and/or agents for violating the constitutional rights of parents and children - without consent, court order, exigency, and/or inquire to determine whether there was a basis to interfere.

Defendants, and each of them, refuse to admit that interfering with the liberty and constitutional right to family integrity without parental consent, court order, and/or exigent circumstances violates a parent's constitutional rights - and continue to do so. Defendants deny that they violated Plaintiffs' rights when Defendants subjected T.E.H. to an unwarranted removal without parental consent, court order, and/or exigent circumstances.  Defendants ratified and/or approved of T.E.H.'s non-consensual unwarranted removal

Defendants, and each of them, failed to train their respective employees and/or agents on the constitutional rights of a parent and child, including, but not limited to:

1. That a child cannot be removed from the custody of his or her parent - without judicial authorization or parental consent - when there is no specific, reasonable, and articulable evidence that the child is in immediate risk of suffering serious bodily injury.
2. That an thorough investigation and/or inquiry must be performed to determine whether or not there is a basis for performing an unwarranted and non-consensual removal of a child.

Without adequate training, Defendants, and each of them, were unfamiliar with and oblivious to Plaintiffs' constitutional rights, when they subjected T.E.H. to a removal from her primary caregiver and custodial mother - without parental consent, court order, and/or exigency.

Defendants' non-consensual unwarranted removal of T.E.H. was not an isolated incident specific to her circumstances. On the contrary, such warrantless non-consensual removals are routine, regular and recurring events, and are perpetrated by Defendants on a daily basis in the same or similar circumstances as alleged herein.

[3] *The above list is not exhaustive. Plaintiffs may seek leave to amend this complaint as additional information is discovered.*

Pro Se 15 (Rev. 12/16) Complaint for Violation of Civil Rights (Non–Prisoner)

Defendants have engaged in each of the customs and/or practices identified above on an ongoing and continuous basis. They continue to engage in said practices on an ongoing and daily basis, and will continue to do so until ordered to stop.

These customs, policies, and/or practices of Defendants were the moving force behind, and the direct and proximate cause of the injuries sustained by Plaintiffs. As a result, Plaintiffs have sustained general and special damages, to an extent and in an amount to be proven separately at trial. In addition, Plaintiffs have incurred, and will continue to incur, attorneys' fees, costs and expenses, including those as authorized by 42 U.S.C. § 1988, to an extent and in an amount subject to proof at trial.

**JURY DEMAND**

Plaintiffs Michelle R Gilbank and T.E.H. demand a jury trial as to all issues so triable.

D.        What injuries occurred due to the acts of the defendants?

Continued trauma and re-traumatization to both plaintiffs. T.E.H. began wetting herself after supervised visits with Michelle and upon being told she had to leave Michelle.  T.E.H. had been fully potty-trained for over a year and Mr. Hoyle began putting her in pullups again.  Separation anxiety was experienced and continues for both Plaintiffs. Irreparable harm to development and security of T.E.H.  Complex-PTSD of Michelle Gilbank worsened to the point of permanent disability determination by the Social Security Administration.  T.E.H. has received counseling and Michelle Gilbank is undergoing continued mental health treatment and prescriptions.

Michelle Gilbank was forced to move out of the family home due to the unsupported, and knowingly unsupportable allegations by the MPD and the WCDHS social workers. Moreover, she was forced into a limited visitation schedule that severely affected her relationship and bonds with T.E.H., and T.E.H.'s bonds with her.

It has now been almost two years since the original unlawful separation of the Plaintiffs and the system was weaponized against them by the conspiracy between the Defendants and Mr. Hoyle.  Michelle now has sole custody of T.E.H. and they are working to rebuild their trust in the system and each other.  Michelle has obtained custody because Mr Hoyle – who was convicted of 1st degree sexual assault of a child for placing his fingers in a six-year-old girl's vagina – admitted that he was placing his fingers on T.E.H.'s vagina daily.  T.E.H. had to undergo a sexual assault examination and was traumatized once again.  Local authorities declined to prosecute because T.E.H. had been placed in Mr. Hoyle's care by WCDHS and he explained to them that he was touching T.E.H. in an attempt to perform daily hygiene.

These additional assaults to T.E.H. would not have occurred but for Defendants violations of the rights of both Plaintiffs and failure of Defendants follow state and federal law and to thoroughly investigate and provide T.E.H. with the safety they proclaimed to be addressing.
 (**All Counts**)

Pro Se 15 (Rev. 12/16) Complaint for Violation of Civil Rights (Non–Prisoner)

## V.    Relief

State briefly what you want the court to do for you. Make no legal arguments. Do not cite any cases or statutes. If requesting money damages, include the amounts of any actual damages and/or punitive damages claimed for the acts alleged.  Explain the basis for these claims.

WHEREFORE, Michelle R Gilbank and T.E.H. pray for judgment against Defendants, as to all causes of action, as follows:
1. General damages and special damages according to proof, but in no event less than $1,000,000;
2. Punitive damages as allowed by law against all Defendants whom are not municipalities;
3. Attorneys fees pursuant to 42 U.S.C. § 1988, and any other appropriate statute;
4. Injunctive relief, both preliminary and permanent, as allowed by law, (including preliminary injunctive relief to be based upon a separate application);
5. Costs of suit incurred herein; and
6. Such further relief as the Court deems just and proper.

## VI.    Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A.    For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served.  I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:          June 29, 2020

Signature of Plaintiff
Printed Name of Plaintiff          Michelle R Gilbank